[No. E001605. Fourth Dist., Div. Two. Mar. 31, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES FRANCIS McCARNES III, Defendant and Appellant.

526

## COUNSEL

Robert E. Dowd and Rex W. Kellough for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Peter Quon, Jr., and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TAYLOR, J.**\*—A jury convicted Charles Francis McCarnes III (defendant) of two counts of second degree murder (Pen. Code, §§ 187, 189); two counts of vehicular manslaughter (then Pen. Code, § 192, subd. 3(a), now Pen. Code, § 192, subd. (c)(1)); one count of driving under the influence of alcohol and drugs so as to cause bodily injury to another (Veh. Code, § 23153, subd. (a)); one count of driving with 0.10 percent or more of alcohol in the blood so as to cause bodily injury to another (Veh. Code, § 23153, subd. (b)); and one count of failing to give the proper information or render the proper assistance at the scene of the accident (Veh. Code, § 20001). In addition, defendant admitted four previous convictions for driving under the influence of alcohol or alcohol and drugs, and pled guilty to one count of driving with knowledge that his driving privileges had been suspended or revoked for driving under the influence of alcohol or drugs (Veh. Code, § 14601.2, subd. (a)). Defendant was sentenced to state prison for a determinate term of four years and eight months and a consecutive indeterminate term of fifteen years to life. This appeal followed.

### FACTS

About 2 p.m. on a summer Saturday afternoon, defendant was driving his Chevrolet west on Allesandro Boulevard just west of its intersection with

_____
\*Assigned by the Chairperson of the Judicial Council.

Moreno Beach Boulevard, east of Riverside. His blood alcohol level was about .27 percent.[1] He tried to pass a Datsun station wagon at a speed of "65-plus."[2] During the passing maneuver, defendant drove into the east-bound lane of Allesandro (a two-lane highway) and collided head-on with a VW station wagon. There were six people in the VW: Frank Ferreira and his wife Jacqueline; their baby daughter Jennifer, who was almost two; their niece Lisa; their teenage nephew Patrick, and Frank's fifteen-year-old sister Elizabeth.

After the collision, defendant walked over to the vicinity of the VW. A bystander was giving artificial respiration to the baby, who, according to a witness, was missing "a big chunk of her head." Defendant leaned over, said "'Don't die, baby, don't die,'" and walked away. A deputy sheriff arrived on the scene and was told that defendant had left the scene. The sheriff drove after defendant. When the sheriff approached him, defendant ran into a field. The sheriff ran after him and overtook him. Defendant told the sheriff that he had tried "to do CPR on the baby."

A CHP officer administered a field sobriety test to defendant within an hour of the collision. The officer testified at trial that in his opinion defendant was "extremely intoxicated." The criminalist (see fn. 1, *ante*) testified that a person had to be a "pretty experienced drinker" to reach a level of .27 percent, and that many persons would become unconscious with a blood alcohol level of less than .30 percent.

As a result of injuries received in the collision, Frank Ferreira and his baby daughter died; Frank's wife Jacqueline had four broken ribs; their nephew Patrick had two broken arms, a broken femur and a broken pelvic bone; their niece Lisa had torn ligaments in her knee, and Frank's sister Elizabeth had a broken nose and front teeth knocked out.

### SYNOPSIS OF PROCEEDINGS IN THE TRIAL COURT

Defendant was charged by information with: two counts of murder; two counts of vehicular manslaughter; one count of driving under the influence of alcohol and drugs so as to cause bodily injury to another; one count of driving with 0.10 percent or more of alcohol in the blood so as to cause bodily injury to another; having previously been convicted of driving under the influence of alcohol or alcohol and drugs (then Veh. Code, § 23102,

---

[1] A blood sample taken from defendant about two hours later revealed an alcohol level of .23 percent. A criminologist testified that the average burn-off rate was about .02 an hour, and that the .23 figure was equivalent to .27 two hours earlier.

[2] This estimate of defendant's speed was given at trial by a passenger in the Datsun.

now Veh. Code, § 23152) in 1975, 1979, 1980, 1981 and 1982; having previously been convicted of reckless driving (Veh. Code, § 23103) in 1978; one count of failing to give information or assistance at the scene of the accident, and one count of driving with suspended or revoked driving privileges.

Defendant pleaded not guilty to the charges, and denied the previous convictions. He then filed a motion, pursuant to Penal Code section 995, to set aside the murder counts on the grounds, incredibly, that the preliminary hearing evidence as to his driving before the collision (see *infra*) and his blood alcohol level were insufficient to support a finding of implied malice. After a hearing, the motion was denied.

At the outset of trial, the People made a motion, pursuant to Evidence Code section 402, to admit defendant's earlier convictions for driving under the influence and for reckless driving, *supra,* for the purpose of proving the element of implied malice in the murder counts. After extensive argument (48 pages in the reporter's transcript) the motion was granted. Shortly afterwards, the court limited its ruling to the 1979, 1980, 1981 and 1982 convictions, and refused to admit the 1975 and 1978 convictions. Thereupon the People dismissed the charges as to those two convictions.

After the court denied his motion to bifurcate the trial on the previous convictions, defendant withdrew his denial of the four remaining convictions, and admitted the truth thereof.

Defendant also withdrew his plea of not guilty to the driving with a suspended or revoked license charge, and pleaded guilty thereto. The prosecutor then made a motion to introduce that conviction on the implied malice issue. The court denied the motion, on the grounds that such evidence would be more prejudicial than probative.

At the end of the People's case the prosecutor read the jury a stipulation as to the four previous convictions, and the court admonished the jury that it could consider the convictions only on the issue of implied malice in the murder counts. Defendant then made a motion, pursuant to Penal Code section 1118.1, for a judgment of acquittal on the murder counts. The motion was denied.

After the conviction, defendant substituted two retained attorneys for the public defender. The new attorneys, who are also representing defendant on appeal, filed a motion for a new trial on the grounds that the trial court had erred in admitting the previous convictions, and, because the jury had returned verdicts convicting defendant of both murder and manslaughter,

that he could be convicted only of manslaughter. After a lengthy hearing, the motion for a new trial was denied.

## DISCUSSION

On appeal, defendant contends: (1) the trial court prejudicially erred in admitting evidence of four of defendant's previous convictions for driving under the influence; (2) there was insufficient evidence to support the verdicts on the murder counts; and (3) the jury verdicts on the murder and the manslaughter counts preclude defendant from being convicted of murder.

### I

### THE ADMISSION OF DEFENDANT'S PREVIOUS CONVICTIONS FOR DRIVING UNDER THE INFLUENCE

As noted, the trial court allowed the People to present evidence of defendant's 1979, 1980, 1981 and 1982 convictions for driving under the influence, and instructed the jury that it could consider the convictions only on the issue of implied malice in the murder counts. On implied malice the jury was instructed as follows:

"Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life *or* when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (CALJIC No. 8.11 (1983 rev.), italics added.)

In deciding to admit the previous convictions, the trial court relied on the second concept of implied malice, *supra* (hereinafter the "dangerous to life" concept), and reasoned that evidence of the convictions "would be highly probative that the defendant . . . did possess the knowledge that his conduct would endanger the lives of others as well as . . . that he consciously and deliberately disregarded such knowledge and did so with a conscious disregard for the lives of other[s]." On the section 352 issue, the court stated, although the evidence was highly prejudicial, that it was "so substantial" on the issues of knowledge and conscious disregard, that its probative value outweighed the danger of undue prejudice. We agree.

Without citing any relevant authority, defendant contends that the court erred in relying on the "dangerous to life" concept of implied malice to

admit the previous convictions, and in including that concept in the jury instruction, *supra.* Defendant argues that the "high probability that it will result in death" concept is the "proper" definition of implied malice, and the "dangerous to life" concept is not. We do not agree.

The alternative definition of implied malice in the 1983 revision of CALJIC No. 8.11 is based on the following language in *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279]: "We have said that second degree murder based on implied malice has been committed when a person does ""'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'''. . . .' (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 719 [112 Cal.Rptr. 1, 518 P.2d 913], quoting from *People* v. *Phillips, supra,* 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].) *Phrased in a different way,* malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. (*People* v. *Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130].)" (*Id.,* at p. 300, italics added.)

In an effort to retain the "high probability [of] death" language, defendant's attorney argued at length to the trial court that the two concepts of implied malice which were stated *disjunctively* in *Watson* and in CALJIC No. 8.11 should be stated *conjunctively* in the jury instruction. The trial court rejected that argument, and used the alternative language of 8.11. On appeal defendant goes one step further, and argues, not that the two concepts should be used *conjunctively,* but that the "dangerous to life" concept should not be used *at all* (this, despite the fact, as pointed out by the prosecutor to the trial court, that the "dangerous to life" concept is the *first* [and therefore impliedly the preferred] concept stated in *Watson).*

Although defendant concedes that our Supreme Court "equated" the two concepts in *Watson,* he argues that the concepts are not equivalent, and that an act whose "natural consequences . . . are dangerous to life" is not as risky as one which has a "high probability that it will result in death." In support of his argument, defendant cites post-*Watson* cases in which implied malice was defined only in terms of the "high probability [of] death" concept. However, because only one concept was used in those cases does not necessarily mean either it was the *only* concept which was proper, or it was the *more rigorous* concept. Moreover, in the cases of *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913], *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225], and *People* v. *Eagles* (1982) 133

Cal.App.3d 330 [183 Cal.Rptr. 784], implied malice was defined only in terms of the "dangerous to life" concept, suggesting that *either* of the two concepts is proper, and that they are but "different way[s]" (*Watson*) of saying the same thing.

Defendant also contends that his previous convictions for driving under the influence were not probative on the knowledge element of implied malice, because the convictions showed only that he knew such driving was *unlawful*, but not that he knew it was *dangerous*. However, the reason that driving under the influence is unlawful is *because* it is dangerous, and to ignore that basic proposition, particularly in the context of an offense for which the punishment for repeat offenders is more severe (Veh. Code, §§ 23165, 23170, 23175), is to make a mockery of the legal system as well as the deaths of thousands each year who are innocent victims of drunken drivers.

Moreover, included in the evidence of two of defendant's convictions, as shown to the jury, was the sentence that he enroll in and complete a drinking driver's education program. Even if we assume defendant did not realize after his *convictions* that it was dangerous to drink alcohol and drive, surely realization would have eventually arrived from his *repeated* exposure to the driver's educational program. To argue otherwise is little short of outrageous.

Finally, defendant's reliance on *People* v. *Esparza* (Cal.App.) and *People* v. *Dellinger* (1984) 163 Cal.App.3d 284 [209 Cal.Rptr. 503] is misplaced. Our Supreme Court has ordered that *Esparza* not be published in the Official Reports, and *Dellinger* is distinguishable, in that the defendant denied committing the act (furnishing cocaine to the victim) to which the previous crime evidence (defendant's prior use of cocaine) was applied. "Generally, knowledge, intent, or state of mind evidence is admissible *if there is no doubt that defendant has committed the act,* but there is some question as to his or her mental state at the time." (*Dellinger, supra,* at p. 298, italics added.) In *Dellinger,* whether or not the defendant furnished the cocaine was in doubt; in the case here, whether or not defendant drove the Chevrolet was not.

■ Defendant also contends that evidence of the prior convictions should not have been admitted because to do so was substantially more prejudicial than probative. (Evid. Code, § 352.) We do not agree. This issue was argued at length in the trial court, and, as noted, the court concluded that the evidence was "so substantial" on the issues of knowledge and conscious disregard, that its probative value outweighed the danger of undue prejudice. In the light of our foregoing analysis, we conclude that the admission

of the evidence was not and could not even remotely be considered an abuse of discretion.

## II

### SUBSTANTIAL EVIDENCE OF MALICE

■ Defendant contends that the evidence of his driving before the collision was insufficient to support a finding of malice. This contention is not supported by the record. Viewed in a light most favorable to the People, the evidence was as follows: defendant was driving with a blood alcohol level of .27 percent, almost three times the percentage necessary to support a finding that he was legally intoxicated. Moments before the collision on Allesandro, defendant passed a pickup truck on Moreno Beach Boulevard (a 2-lane road with a speed limit of 45 miles per hour) at a speed of close to 70, and continued to drive a substantial distance in the opposite lane before pulling over. He then tried to pass a van and a boat, and pulled out so far to his left that he went into the dirt shoulder on the opposite side of the road. From the shoulder he cut across sharply in front of the van and the boat, just before the stop sign at the intersection of Moreno Beach Boulevard and Allesandro Boulevard. He turned west on Allesandro, which has a speed limit of 55 miles per hour (no one saw whether or not he stopped at the stop sign), and shortly afterwards tried to pass a Datsun station wagon at a speed of over 65 miles per hour, at a time when the VW station wagon he collided with could be clearly seen approaching in the opposite direction. The collision occurred a few feet beyond the Datsun station wagon.

In sum, defendant is arguing, as a matter of law, that there is no substantial evidence that driving by a person who has a blood alcohol level of .27 percent, and who executes two extremely reckless passing maneuvers and embarks on a third in the face of an oncoming vehicle, has "natural consequences . . . which are dangerous to life," or "a high probability [of] result[ing] in death." (*People* v. *Watson, supra,* 30 Cal.3d 290, 300.) This is nonsense, if not an affront to this court. The foregoing evidence, coupled with the defendant's four previous convictions for driving under the influence, is not only sufficient but overwhelmingly upholds the finding of implied malice. Were it not for the reluctance expressed in *Watson* (at p. 301) we would be inclined to hold this evidence sufficient to prove implied malice as a matter of law.

On the dangerousness of the *act* of driving while intoxicated, the California Supreme Court observed in *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257 [198 Cal.Rptr. 145, 673 P.2d 732]: "The drunk driver cuts a wide swath of *death,* pain, grief, and untold physical and emotional injury

across the roads of California and the nation. The monstrous proportions of the problem have often been lamented in graphic terms by this court and the United States Supreme Court. (See *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 898-899 [157 Cal.Rptr. 693, 598 P.2d 854]) [quoting U.S. Dept. Health, Ed. & Welf., 3d Special Rep. U.S. Cong. on Alcohol and Health (1978)]; . . .) . . . Indeed, in the years 1976 to 1980 there were many more injuries to California residents in alcohol-related traffic accidents than were suffered by the entire Union Army during the Civil War, and more were *killed* than in the bloodiest year of the Vietnam War. (Compare Cal. Highway Patrol, 1980 Ann. Rep., Fatal & Injury Motor Vehicle Traffic Accidents, p. 2, tables 1a, 1b, 1c, 1d, and p. 58, tables 6a, 6b, with Statistical Abstract of U.S. (103d ed. 1982) p. 361, tables 598, 599.) Given this setting, our observation that '[d]runken drivers are *extremely dangerous* people' (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890, 899) seems almost to understate the *horrific* risk posed by those who drink and drive." (*Id.,* at p. 262, italics added.)

Additionally, every year in the United States more than 50,000 people are killed on U.S. highways as a result of traffic accidents. Approximately one-half of these traffic fatalities are alcohol-related. (U.S. Dept. Transp., 1977 Highway Safety Act Rep., Appen. A-9, table A-1; cf. Jones & Joscelyn, Alcohol and Highway Safety 1978: A Review of the State of Knowledge (U.S. Dept. of Transp. 1978) pp. 11-26.)

Finally, the California Legislature has recognized just how dangerous driving under the influence can be by making the punishment for repeat offenders much more severe (Veh. Code, §§ 23165, 23170, 23175).

On defendant's *knowledge* and *conscious disregard* that his driving while intoxicated endangered the lives of others, in *Watson* the Supreme Court held, citing *Taylor* v. *Superior Court, supra,* that " 'One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*People* v. *Watson, supra,* 30 Cal.3d 290, 300-301.)

Here, of course, we have an additional element, which was not present in *Watson,* namely, defendant's *four* previous convictions for drunken driving, and his *repeated* exposure to a drinking driver's education program.

Defendant claims that his driving was far less dangerous than the defendants in the vehicular murder cases of *Watson, supra,* and *People* v. *Fuller* (1978) 86 Cal.App.3d 618 [150 Cal.Rptr. 515], where the defendants drove

at higher speeds and ran through red lights.[3] This contention is absurd. The case at bench, unlike *Watson* or *Fuller,* presents a portentous *pattern* of reckless, high-speed passing maneuvers on two-lane roads, involving repeated and deliberate driving into oncoming traffic, and culminating in a head-on collision. Defendant's conduct was even more egregious because the oncoming vehicle he collided with was clearly visible to defendant as he entered the opposing lane.

Moreover, "nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary to a finding of second degree murder . . . *Watson* . . . deliberately declin[ed] to prescribe a formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach." (*People* v. *Olivas* (1985) 172 Cal.App.3d 984, 988-989 [218 Cal.Rptr. 567].) *Olivas,* incidentally, was a *Watson*-type vehicular homicide case in which the defendant was charged with murder, convicted of second degree murder in a court trial, and sentenced to a prison term of 15 years to life for the murder. We note this in response to defendant's comment in his brief that "[n]o case has come to our attention in which the defendant in a *Watson*-type case has received a sentence as severe as that imposed here." Moreover, in *Olivas* there was only one homicide victim. Here there were two. Although the court here could have imposed consecutive sentences on the two murder counts (Cal. Rules of Court, rule 425(a)(4); see also *People* v. *Eagles* (1982) 133 Cal.App.3d 330 [183 Cal.Rptr. 784]), and the People so requested, the court chose not to do so.

## III

### THE VERDICTS ON THE MURDER AND THE MANSLAUGHTER COUNTS

During its deliberations, the jury asked the court whether it should process verdicts on the murder and the manslaughter counts. The court responded that a verdict must be processed on each such count. Despite that response, the jury returned guilty verdicts on the murder counts and blank verdicts on the manslaughter counts. The court instructed the jury to resume deliberations and to return verdicts on the manslaughter counts. It did so, and returned guilty verdicts on those counts. Defense counsel requested that the jurors be polled on the murder counts only. The jurors were polled on those counts, and all answered in the affirmative.

---

[3]Defendant also relies on *In re Peter F.* (Cal.App.) which has been deleted by our Supreme Court, and on *People* v. *Pulley* (1964) 225 Cal.App.2d 366 [37 Cal.Rptr. 376], which was disapproved by the Supreme Court in *People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647], and in any event is distinguishable because it is a felony murder case.

■ In his motion for a new trial, defendant argued that the jury's guilty verdicts on the manslaughter counts indicated that it had a reasonable doubt as to malice, and that he therefore could not be convicted of murder. The court disagreed, noting that the jury "clearly found malice" when it returned guilty verdicts on the murder counts and blank verdicts on the manslaughter counts, and that any error in the procedure which resulted in the guilty verdicts on the manslaughter counts was not prejudicial. At the People's request, the court then dismissed the manslaughter counts.

On appeal, defendant ignores the manner in which the verdicts were returned, and relies on *People* v. *Dewberry* (1959) 51 Cal.2d 548 [334 P.2d 852], where the court said that when "reasonable doubt exists as between degrees of the same offense or as between [an] inclusive and included offense, the jury can only convict of the crime whose elements have been proved beyond a reasonable doubt." (*Id.,* at p. 556.) However, *Dewberry* is inapposite because, as the trial court found here, the manner in which the verdicts were returned showed that the jury "clearly found malice," i.e., murder. Thus no reasonable doubt as to that offense existed. Moreover, assuming, as defendant argued below, that vehicular manslaughter is a lesser included offense of murder (*People* v. *Watson* (1983) 150 Cal.App.3d 313 [198 Cal.Rptr. 26]), the jury's guilty verdicts as to both offenses should result in the dismissal of the *lesser* offense (*People* v. *Tideman* (1962) 57 Cal.2d 574, 582 [21 Cal.Rptr. 207, 370 P.2d 1007]), as was done here. Such dismissal "would not affect the integrity of the conviction and sentence for the greater [offense]." (*Id.*)

DISPOSITION

The judgment is affirmed.

Rickles, Acting P. J., and McDaniel, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 31, 1986.