[No. F021752. Fifth Dist. Aug. 11, 1995.†]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO MORALES GARCIA, Defendant and Appellant.

**[Opinion certified for partial publication.‡]**

---

†Review granted November 22, 1995. Review dismissed and opinion ordered published February 15, 1996.

‡Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II B and part III.

COUNSEL

Andrew Cappelli, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Shirley A. Nelson and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARDAIZ, P. J.—By information filed in Merced County Superior Court on December 28, 1993, appellant, Antonio Morales Garcia, was charged with the following offenses: (1) the murder of Maria Prado, in violation of Penal Code section 187; (2) gross vehicular manslaughter while intoxicated in violation of Penal Code section 191.5; (3) driving while under the influence of alcohol or drugs resulting in injury in violation of Vehicle Code section 23153, subdivision (a); (4) driving with a blood-alcohol level of .08 percent or more resulting in injury in violation of Vehicle Code section 23153, subdivision (b); (5) driving with a suspended or revoked license in violation of Vehicle Code section 14601.2, subdivision (a); (6) and hit-and-run driving in violation of Vehicle Code section 20002, subdivision (a).[1] It was further alleged that, within the last seven years, appellant had suffered a prior conviction for driving with a blood-alcohol level of .08 percent or more.

Appellant was arraigned on December 29, 1993, entered pleas of not guilty to all charges, and denied the prior conviction allegation. In response to a pretrial motion made by the defense, counts 3 through 5 were dismissed.

On the first day of trial and outside the presence of the prospective jurors, appellant pleaded guilty to count 6 (hit-and-run driving). The parties then proceeded to trial on the remaining counts. On the eighth day of trial, the jury found appellant guilty of the offenses alleged in both count 1 (second degree murder) and count 2 (gross vehicular manslaughter while intoxicated).

Imposition of sentence occurred on May 18, 1994. Appellant was denied probation and ordered imprisoned for a term of 15 years to life with the possibility of parole on count 1, the upper term of 10 years on count 2, stayed under section 654, and a concurrent term of 6 months on count 6. He

---

[1]Hereinafter, all statutory references are to the Penal Code unless otherwise indicated.

was awarded appropriate time credits and ordered to pay a Government Code section 13967 restitution fine in the amount of $4,400.

Notice of appeal was timely filed on June 7, 1994.

## FACTS

On December 18, 1992, around 11 p.m., Mr. Kilgore was stopped at a stop sign on Cunningham at Santa Fe and waiting for traffic to clear when a car coming out of LeGrand made a right turn onto Cunningham and struck his truck causing it to spin around. As the car accelerated away from the scene, Kilgore noticed it had taillights like those belonging to a large, "late model '70 Chevy." The vehicle was last seen headed north on Cunningham. At trial, the parties stipulated that appellant was the driver of the vehicle involved in the collision with Mr. Kilgore.

Merced County Sheriff's Deputy Fournier was on duty on December 18, 1992, when, around 11 p.m., he was advised that a hit-and-run accident had just occurred in the area of LeGrand and Cunningham roads. The suspect vehicle was described as a large vehicle, dark in color, last seen heading northbound on Cunningham and possibly headed for Merced via Highway 140.

The deputy was heading eastbound on Highway 140 at an approximate speed of 50 miles per hour looking for this vehicle. As cars passed the officer, he would glance to the left to see whether they matched the description of the hit-and-run vehicle.

Deputy Fournier's patrol vehicle was the last of three cars in the eastbound lane. West of Arboleda, the next cross street, the middle vehicle signaled and successfully passed the first car. This was the last the officer saw of the passing vehicle. He did not recall seeing any additional westbound traffic at this point.

Approximately 20 seconds later and somewhere east of Arboleda on Highway 140, he looked ahead and saw a steam cloud and a burst of light. What he observed turned out to be a fireball from an accident that had just taken place. Deputy Fournier could not recall if something had passed him immediately before the accident which would have diverted his attention to the side.

When he came upon the scene, the deputy saw debris in the roadway and a large bronze or gold-colored Chevy Impala on the north shoulder of the

road, its engine ablaze. On the southern shoulder of the roadway, he saw a white Chevy Baretta. He could not say which direction the vehicles had been traveling prior to impact.

Deputy Fournier contacted the driver of the gold car, whom he identified as appellant, and told him an ambulance was on the way. He put out the fire and then went to check on the occupant of the Baretta. Using some of the debris from the accident, a large metal bar, he tried, without success, to pry open the door of the Baretta. The only other debris that was moved following the accident occurred when a passerby was pulling the hood of the Baretta out of the roadway. Seeing this, the deputy ordered him to stop.

At trial, the deputy said he was certain that the passing car had completed the pass before the accident occurred. His response to questions raised by defense counsel suggested that he did not believe this car was in any way involved in the accident.

Officer Winter of the California Highway Patrol (C.H.P.) testified that he was summoned to an accident scene on state Highway 140 near Arboleda in the evening hours of December 18, 1992. The officer described Highway 140 as an unlit, two-lane, east-west, level highway.

Upon his arrival, Officer Winter observed a full-size brown Chevy on the north side of the roadway facing south. The occupant of this vehicle, later identified as appellant, appeared to be pinned behind the steering wheel. The other vehicle, a white Chevy Baretta, was located to the east on the south side of the road.

Based on the appearance of the vehicles, the officer opined that they had been involved in a head-on collision. The physical evidence found in the roadway caused Officer Winter to place the point of impact approximately five feet inside the eastbound lane of Highway 140—the lane in which the white vehicle was traveling prior to impact.

Officer Esmay of the C.H.P. accident investigation team was subsequently called to investigate the accident. He placed the area of impact between three and five feet to the left or south of the center line (i.e., between three and five feet inside the eastbound lane). The officer noted that the angle of approach of the larger Chevy towards the smaller Chevy was 10½ degrees. He said this type of movement would be consistent with weaving or drifting and certainly meant that there had to be some turning movement by the larger vehicle prior to impact. He calculated the precollision speed of the full-size Chevy at 47½ miles per hour and the smaller white Chevy at 44½

miles per hour. There was no physical evidence to show that either driver applied the brakes prior to impact. This does not mean, however, that the vehicles did not slow down before impact—only that no physical evidence remained behind to show that they had applied their brakes. When the vehicles struck, they overlapped by roughly one and three-tenths feet. Based on his investigation, Officer Esmay opined that the collision occurred in the eastbound lane with vehicle No. one, the brown Chevy, crossing over the center line and remaining there until impact. Of that, he had no doubt. Crossing over the center line is a violation of Vehicle Code section 21650.

Officer Esmay said he was aware that Deputy Fournier had mentioned something about a third vehicle passing. However, Esmay also said that, to his knowledge, no physical evidence was found at the scene that would support a claim of a third car passing these vehicles on the shoulder.[2] He also stated that Deputy Fournier had given him no indication that the third vehicle was responsible for the accident. Indeed, the third vehicle was not even mentioned in the initial report prepared regarding this accident.

The parties stipulated at trial that the collision caused the death of Maria Prado. They also stipulated that a blood sample was obtained from appellant in a medically approved manner and as to the sufficiency of the sample's legal chain of custody.

C.H.P. Officer Frederick testified that he interviewed appellant regarding the accident on December 23, 1992. C.H.P. Officer Ortiz acted as translator during the interview since appellant spoke only Spanish and Officer Frederick spoke only English. After waiving his *Miranda* rights,[3] appellant agreed to talk to the officers. Appellant seemed to have no difficulty understanding or responding to the questions put to him although both officers acknowledged that appellant had just been released from the hospital at the time of their interview.

Appellant admitted owning a tan Chevy Caprice and being involved in only one accident on the day in question which he described as occurring in Livingston on his way to look for work in Delhi. He said that he was the only person in his car and was making a turn (he could not remember which direction) when another vehicle came up on him "fairly quick" and the two cars struck. When the officer told appellant that the doctors found alcohol in

---

[2]According to Officer Weidenman, who assisted in this investigation, she thought the shoulders of the road were examined for such evidence in mid-January after a considerable amount of rainfall.

[3]*Miranda* v. *Arizona* (1966) 384 U.S. 436, 478-479 [16 L.Ed.2d 694, 725-726, 86 S.Ct. 1602, 10 A.L.R.3d 974].

his system, he said they were wrong as he had not consumed any alcohol that day. Before concluding the interview, Officer Frederick asked appellant if he would like to add anything to his statement regarding "either accident." Appellant told the officer, "you know what happened." He started to say "you were there" but he stopped short and told the officer that he did not want to discuss the matter any further.

At trial, a Department of Justice criminalist testified that he tested the sample of appellant's blood drawn at 1:30 a.m. on December 19, 1992, and found that it contained .16 percent blood-alcohol. The criminalist said this meant that appellant would have had a blood-alcohol level of .20 percent around 11:15 or 11:20 p.m. the evening before.

In his opinion, a person could not operate a car in a safe manner with this level of alcohol in his or her bloodstream. Indeed, the criminalist was of the opinion that no one could safely operate a motor vehicle with a blood-alcohol as low as .10 percent. A person such as appellant, with a blood-alcohol level of .20 percent would experience even a greater degree of impaired judgment,[4] delayed reaction time, and diminished divided attention skills (the ability to perform more than one task at a time such as those needed to operate a car safely). Such a person would generally panic if presented with an emergency situation. The criminalist went so far as to say that he did not think a person with appellant's blood-alcohol level would be able to drive a car in a straight line although he did admit that an alcohol tolerant driver could probably manage it on a straight, familiar road with good weather. The tolerant driver would nevertheless have difficulty responding to an emergency situation.

Evidence was also presented regarding former occasions when appellant had been arrested for driving under the influence. On one such occasion, around 9 p.m. on August 28, 1990, Merced County Sheriff's Deputy DeBusk observed appellant driving a tan Cadillac that was weaving from the left of the center line to the right of the fog line. The officer initiated a traffic stop and, when he made contact with appellant, detected an odor of alcohol about his person. Because he suspected that appellant may have been driving while under the influence of alcohol, the deputy sought assistance from C.H.P. in accordance with his department's practice.

C.H.P. Officer Lawson was the officer who responded. Based on appellant's physical appearance, poor performance on the field sobriety tests, and

---

[4]This would encompass, among other things, the judgment needed to physically operate a vehicle (i.e., judging distances, etc.), as well as the judgment needed to fully appreciate the hazards of driving. The criminalist explained that, as to the latter, the appreciation of risk is not lost but the ability to mentally process the information needed to respond to the risk physically is slowed.

described driving patterns, Officer Lawson concluded that appellant had been driving while under the influence of alcohol and placed him under arrest. A blood sample subsequently obtained revealed a blood-alcohol level of .13 percent.

Approximately one month later, on September 25, 1990, appellant was arrested a second time for driving under the influence. A blood sample obtained on this occasion revealed a blood-alcohol level of .15 percent.

Appellant was arrested again on February 23, 1992, for driving under the influence. On this occasion, appellant was observed driving his car across the center line and almost entirely into the lane of oncoming traffic. A patrolman traveling in the opposite direction had to leave the roadway to avoid a head-on collision with appellant.

Using both lights and siren, the officer tried to initiate a traffic stop but appellant failed to yield. During the pursuit, appellant continued to drive on the wrong side of the road. Four or five additional vehicles were forced off the roadway to avoid a collision with appellant.

When appellant finally stopped his vehicle, he got out of the car and tried unsuccessfully to flee on foot. He was observed to stagger and stumble about. The officer noted that appellant stood a good chance of falling down if he had not been leaning up against the patrol car. Using a Breathalyzer, appellant's blood-alcohol was found to be .18 percent at 6:56 p.m. on February 23, 1992.

Evidence was also offered to show that appellant attended two of the fifteen 2-hour sessions that comprise the first offender's program. During these sessions, attendees were customarily told, in Spanish, about the negative effects alcohol has on the brain and, in particular, the effects it has on one's ability to drive safely. They were specifically told that combining alcohol with driving is likely to result in an accident.

*Defense*

Mr. Johnson, a consulting mechanical engineer with a background in vehicle design and testing, testified that he conducted his own investigation into the cause of this fatal accident. He reviewed a number of the documents and photographs related to the accident and examined appellant's car. He was unable to examine the damaged portion of the Baretta because it had been removed and discarded by a salvage company prior to his having been retained in this matter. He also visited the accident site on May 14, 1993.

Johnson said he agreed with the determinations made by C.H.P. regarding the crash site, the pre-impact speeds of the vehicles, and the angle of impact. He disagreed with the officers' conclusions that the angle of impact was consistent with appellant drifting or weaving over the center line.

The type of turning movement seen here was, in his experience, inconsistent with that of an inebriated driver. Mr. Johnson described the angle leading to impact as a "pretty severe turn" or "an intended steer maneuver" which he found more consistent with a third vehicle being involved in the accident. The angle was more than five times that of an intentional lane change which is, in turn, greater than the angle of a drift. The fact that both drivers were operating their vehicles below both the speed limit and the normal rate of flow at the time of the accident suggested to Johnson that they may have been in the process of reacting to a third vehicle when the collision occurred. He admitted, however, that there was no physical evidence to either support or refute that theory.

In forming his opinion, Johnson assumed the third car had not completed its pass when the accident occurred. He opined that the third vehicle was on the far right side of appellant's lane leaving appellant with the sole option of moving to the left. He reached this conclusion after calculating the time it would take the third vehicle to complete its pass. Johnson found it unlikely that Deputy Fournier would have been looking at the vehicle passing him westbound for the entire seven and three-tenths seconds it would take for the third vehicle to complete its pass. He believed the officer probably looked at the vehicle passing him for two to three seconds before he looked forward again and saw the fireball. Two or three seconds was simply not enough time for the third vehicle to complete its pass.

Johnson acknowledged that he had not interviewed Deputy Fournier personally. He said he based his conclusions on the statements attributed to Fournier in the reports prepared by other officers. Johnson was surprised to learn of Fournier's preliminary hearing testimony in which the officer clearly said the third vehicle was not involved in the accident. The defense expert considered the preliminary hearing testimony a significant change from the statements Fournier purportedly made when interviewed by other law enforcement officers shortly after the accident.

Appellant also presented evidence to show he was of limited intelligence. Using a battery of standardized tests, Dr. Neufeld, a clinical psychologist, learned that appellant had a rough IQ of 68—a score that falls within the range for mild mental retardation.

One test Neufeld used was the "WAIS-R," which is a test that has never been performed in Spanish or with the use of an interpreter. As such, no

testing has been done to establish the validity of the results obtained in a test performed using either approach.

Despite the fact that appellant was born in Mexico and speaks only Spanish he was given portions of the WAIS-R test. He was also given more instruction, some of it in Spanish, than is customary. Dr. Neufeld was of the opinion that this procedure would, if anything, tend to inflate appellant's scores.

Dr. Neufeld acknowledged the fact that Atascadero State Hospital had ruled out the diagnosis of mild mental retardation based on appellant's ability to function within the confines of the hospital; he simply disagreed with the hospital's determination.

Dr. Neufeld said he observed some indicators of traumatic brain damage during the testing process but felt they were insufficient to support such a diagnosis. However, he later testified that none of the test results indicated brain damage.

The doctor explained that individuals with appellant's test scores can learn academic skills appropriate to approximately the sixth grade level although they generally require a great deal of repetition, reinforcement, and encouragement to do so. In addition, the information must be presented in a very simple way. Dr. Neufeld found appellant's claim to have taught himself how to read and write inconsistent with his IQ score.

The doctor acknowledged that people are exposed to a tremendous amount of information regarding the dangers of drinking and driving in today's society. He said appellant would be able to "pick up on" the information generally available in the culture and would be able to interpret it in very concrete ways despite his diminished cognitive abilities.

Dr. Neufeld would not expect appellant to have gained anything from the two driving-while-intoxicated classes he attended. When asked whether he would expect appellant to realize the risks to human life associated with drinking and driving if he had not previously experienced them, the doctor said he would expect appellant to think of driving while intoxicated as something that he should not do because he may get caught.

In speaking with appellant's relatives, Dr. Neufeld learned that there had been no change in appellant's mental status over the years. From this, the doctor reasoned that appellant's mental abilities were the same before and after the incident. Dr. Neufeld acknowledged, however, that it was obvious

in his discussions with the relatives that they had not had the opportunity to observe appellant functioning in society since the accident and that they knew very little about appellant's precollision abilities.

Nevertheless, the doctor said he would expect appellant to complain of lost abilities if he had in fact sustained brain damage in the accident. While appellant's records contained certain complaints about difficulties with memory, concentration and attention, Neufeld did not find them, in and of themselves, indicative of brain damage. He said these complaints could also be consistent with depression and noted that appellant was suffering from depression at the time these complaints were made.

On cross-examination, Dr. Neufeld admitted that his testimony regarding appellant's present ability to learn would not accurately reflect appellant's pre-collision abilities if appellant had actually sustained brain damage in the accident. He acknowledged that the injuries appellant sustained in the accident (crushed orbital bone) could result in brain damage and that improvement in memory following the accident is also consistent with brain damage. He nevertheless attributed appellant's apparent improvement in memory of the events surrounding the accident to having the police report read to him as well as someone whose depression is lifting.

The doctor also conceded that appellant's performance on the tests was dependent on his ability to see and that he, Dr. Neufeld, was not competent to evaluate a person's visual acuity. He knew appellant was virtually blind in one eye but said appellant was able to count the number of fingers he held up some distance away.

Dr. Hamm, a licensed psychologist, said he examined appellant on May 26, 1993, to determine whether he was competent to stand trial. The doctor initially found that appellant had a significant impairment in memory and concentration. He described appellant's intellectual functioning as "concrete" which meant that appellant was only capable of thinking at the lower levels of abstraction. Based on his limited examination, Dr. Hamm initially expressed diagnoses of atypical depression and possibly dementia due, in part, to long-term alcohol abuse.

After learning of the psychological test results and the initial diagnosis by Atascadero, Dr. Hamm changed his diagnosis so that he now concurs with Dr. Neufeuld's diagnosis of mild mental retardation. Dr. Hamm explained that appellant's low level of intellectual functioning was detected during his initial interview but, due to the limited nature of his examination, he was not able to perform the battery of tests needed to differentiate between dementia and mental retardation.

Dr. Hamm testified that a person with appellant's IQ probably would not be capable of developing a very abstract concept of what is dangerous. Instead, that person would develop what the doctor referred to as a more reflexive concept. He gave the following example: people with appellant's IQ level do not learn that this is the law so I must do x, y, z. Instead, they learn very rudimentary principles like "this is no and this is yes, and do this and don't do that . . . ." The doctor explained that an IQ of around 90 is needed before a person is able to think abstractly so that he can apply what he has learned in one situation to other situations. He nevertheless agreed that one with appellant's IQ would "probably" comprehend at some level that driving 100 miles per hour through town is dangerous both to oneself and others.

When asked what appellant might learn from his prior experiences of driving after drinking, Dr. Hamm said he would learn that one gets arrested when they do so. To understand that he may hurt someone as a result involves an abstract concept that appellant is not going to grasp. In appellant's case, someone would probably have to get hurt as a result of drinking and driving once, twice or perhaps even three times before appellant would appreciate the risk associated with such conduct.

Dr. Deutsch, a physician specializing in addiction medicine, examined appellant on May 7, 1993. The doctor explained how alcohol affects different parts of the brain which, in turn, affects one's ability to perform certain mental and physical functions. He said that a blood-alcohol level of as low as .05 percent can result in reduced judgment capabilities. One's ability to reason (engage in abstract thinking) also appears to be affected at relatively low levels of blood-alcohol. Cerebellum effects, such as coordination and speech, would begin to be affected in nontolerant drinkers at a blood-alcohol level of .08 percent. Tolerant drinkers, on the other hand, may not exhibit difficulties with these functions at this blood-alcohol level.

A person with a blood-alcohol of .20 percent (such as appellant at the time of the accident) would have been experiencing deficits in both cortex and cerebellum functions. In a nontolerant person this would result in a reduction in his decisionmaking capabilities, including the ability to recognize the danger of driving while intoxicated, as well as an increase in his reaction time. The likelihood of failing to recognize the dangers associated with driving while intoxicated is greater for a person with appellant's reduced mental capabilities. The doctor did note, however, that some people are capable of driving a vehicle in a straight line even with a blood-alcohol level of .20 percent.

The doctor also discussed one's ability to evaluate cause and effect. He explained that the closer in time two things occur, the more people tend to assume they are causally related even though the contrary is true.

During the interview, Dr. Deutsch learned that appellant had a history of drinking excessively for more than 20 years. He could not determine whether appellant was a tolerant drinker because appellant was not a reliable historian when it came to his drinking habits. The doctor nevertheless concluded that appellant was addicted to alcohol and was in denial. He explained that mental retardation makes coming to terms with the problem even more difficult.

In his opinion, appellant would require intensive, long-term treatment to overcome his drinking problem due to his decreased mental capability. As such, he would have learned nothing from attending only two classes out of fifteen offered. Somewhat later in his testimony, however, the doctor admitted that appellant did learn that he should not be drinking.

Ms. Arce testified that she came into contact with appellant on December 24, 1992, when she interpreted for him in superior court.[5] She said he was in very bad shape at the time. He was in a wheelchair, had one leg bandaged, a very swollen foot, and a patch over one eye. Appellant complained that he was having a lot of pain and did not seem to realize where he was or what was going on around him.

*Rebuttal*

Officer Weidenman testified that she had been a patrol officer for 11 years and, in that capacity, has had approximately 700 to 1,000 encounters with people who drive under the influence. She has observed everything from weaving within the lane, to jerking in and out of the lane, to running stop signs, to speeding, to not moving at all. In her opinion, the 10½ degree angle described by Johnson was consistent with the jerking movements she has observed by inebriated drivers.

Dr. Lloyd, a psychiatrist, said he interviewed appellant in June of 1993, for the limited purpose of determining his competency to stand trial. While he did not administer any type of intelligence test, Dr. Lloyd did not see any signs of mental retardation but instead believed appellant to be in the low normal range of intelligence. He noted Atascadero Hospital staff had ruled out mental retardation based on the staff's extended observations of appellant.

The doctor also discussed a certain shortcoming of the WAIS-R intelligence test—that is, that the test has been "normed" for a particular group of

---

[5]Her contact with appellant came the day after he was interviewed by police regarding the accident which led to these charges being filed.

people. If one were to give that test to a person outside the group for which it is normed, the results obtained would be of questionable validity. If a test is given to a person who is raised in another country under different social circumstances and especially if that person has a limited education, a lot of good questions would be raised about the validity of the test.

Dr. Lloyd said even a person with mild mental retardation can learn it is dangerous to drink and drive and that someone might be hurt as a result. He concluded appellant was capable of understanding that concept. The doctor pointed to appellant's performance at Atascadero that proved he was capable of abiding by rules. He also noted that people with this IQ level can learn from their personal experiences.

Dr. Paez, a psychiatrist, said appellant was under his daily care during the two months he spent in Atascadero State Hospital. When appellant first presented at the hospital, he was not suffering from any mental disorder although he was in denial which the doctor said was central to alcoholism. For example, appellant claimed the other driver crossed the divided line and that the hit and run accident occurred because the other car was sticking out in the road. As time went on, however, appellant's memory improved and he was gradually able to remember the evening's events. In therapy, appellant admitted hitting the first car without stopping and then hitting a second car. He even admitted that the girl inside the second car would not have been killed if he had stopped after the first accident.

Dr. Paez went so far as to say that, in his opinion, appellant could have been returned to court immediately upon his arrival at Atascadero. The doctor never believed appellant was mentally retarded. His impression was that appellant simply took his time learning the material presented to him at the hospital. Dr. Paez said appellant passed the competency tests and demonstrated his awareness of the issues. Appellant also helped teach other Spanish-speaking patients the evils of alcohol.

The doctor was of the opinion that appellant was capable of understanding the concept that drinking and driving might kill someone. In fact, appellant was able to grasp the abstract concepts involved in the mock trial process that he went through at Atascadero. During cross-examination, the doctor admitted the concepts were "more or less" repeated daily and that appellant obtained an understanding of these concepts at the end of the process.

## DISCUSSION

The arguments presented by appellant concern essentially three topics: (1) what he claims to be the prejudicial use of evidence of his prior episodes of

driving under the influence; (2) whether gross vehicular manslaughter while intoxicated is a "lesser included offense" of murder thereby necessitating the striking of his conviction for the lesser included offense; and (3) whether the sentencing court erred when it imposed a $4,400 restitution fine. We shall address each of these areas of contention in turn.

I

*Use of Prior Instances of Driving Under the Influence Evidence*

 Appellant contends the trial court abused its discretion under Evidence Code section 352 when it allowed the jury to hear evidence related to his three prior arrests for driving under the influence of alcohol only one of which led to a conviction. He acknowledges the People had the burden of proving his subjective awareness of the dangers associated with drinking and driving as an element of murder (implied malice) but insists the evidence was not relevant on that basis. He directs our attention to *People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279] *(Watson I)*; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532 [224 Cal.Rptr. 846]; and *People v. Brogna* (1988) 202 Cal.App.3d 700, 709 [248 Cal.Rptr. 761], which he claims provide support for his position. Respondent argues the evidence was properly admitted on the issue of implied malice and that any potential for prejudice resulting from its admission was eliminated by the use of a limiting instruction.

Under Evidence Code section 352, a trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) The law is clear that "[i]ts exercise of discretion under Evidence Code section 352 will not be disturbed on appeal absent a clear abuse, i.e., unless the prejudicial effect of the evidence clearly outweighs its probative value. [Citation.]" *(People v. Karis* (1988) 46 Cal.3d 612, 637 [250 Cal.Rptr. 659, 758 P.2d 1189]; accord, *People v. Mickey* (1991) 54 Cal.3d 612, 668 [286 Cal.Rptr. 801, 818 P.2d 84]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251].) Having reviewed the record, we find no abuse of discretion.

The record clearly shows the People prosecuted appellant for murder based on a theory of implied malice.

 In cases of vehicular homicide, implied malice has been found to exist "when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." *(Watson I,*

*supra*, 30 Cal.3d at p. 296.) It has also been found to exist "when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Id.* at p. 300.) From these statements, it can be discerned that "a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Id.* at pp. 296-297.) Implied malice, like all other elements of a crime, may be proven by circumstantial evidence. (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 346-347 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Klvana* (1992) 11 Cal.App.4th 1679, 1704 [15 Cal.Rptr.2d 512].)

Here, the trial court correctly reasoned that the evidence related to appellant's prior conviction for driving while intoxicated and his limited participation in drinking driver programs was relevant to prove the knowledge element of implied malice. This ruling finds ample support in the case law. (*People* v. *Talamantes* (1992) 11 Cal.App.4th 968 [14 Cal.Rptr.2d 311]; *People* v. *David* (1991) 230 Cal.App.3d 1109 [281 Cal.Rptr. 656]; *People* v. *Murray* (1990) 225 Cal.App.3d 734 [275 Cal.Rptr. 498]; *People* v. *Brogna*, *supra*, 202 Cal.App.3d 700; *People* v. *McCarnes*, *supra*, 179 Cal.App.3d 525.)

While the above referenced cases dealt with prior *convictions* and their attendant educational programs, appellant has not presented us with any reason to treat his prior instances of misconduct not resulting in a conviction any differently.[6] No conviction is needed before evidence of other crimes or misconduct of a defendant can be introduced under Evidence Code section 1101 to prove knowledge.[7] (*People* v. *Wilson* (1992) 3 Cal.4th 926, 939-940 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Brogna*, *supra*, 202 Cal.App.3d 700, 706; cf. *People* v. *Ewoldt*, *supra*, 7 Cal.4th 380, 401, 402 [same but for proof of common design or plan or identity].)

Appellant also challenges the trial court's decision to allow the People to introduce evidence of the events leading to his former arrests for driving under the influence. We find these facts particularly relevant in light of appellant's claim that, due to his mental retardation, he was capable of

---

[6]The record does not shed any light as to why two of appellant's arrests for driving under the influence did not lead to conviction.

[7]Evidence Code section 1101 provides: "(a) Except as provided in this section . . . evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact . . . such as . . . knowledge . . . ." The vitality of this section continues today despite the passage of Proposition 8. (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 390 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

learning only after repeated exposure to the same information. These facts show that the dangers of driving while intoxicated were demonstrated to appellant firsthand when, on one such occasion, he was unable to keep his vehicle in his own lane and, on another occasion, he not only crossed over the center line but continued to drive in the wrong lane for some distance thereby forcing a number of vehicles, including one patrol car, to leave the roadway to avoid a head-on collision with him.

While this evidence was undoubtedly harmful to appellant, that is not what is meant by undue prejudice under Evidence Code section 352. ■ Case law makes clear that " ' "[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues." ' " (*People* v. *Garceau* (1993) 6 Cal.4th 140, 178 [24 Cal.Rptr.2d 664, 862 P.2d 664].) ■ As previously explained, this evidence was highly relevant on the issue of implied malice. The court correctly determined that any potential for prejudice that might otherwise result from its admission could be minimized through use of a limiting instruction. Given these circumstances, we believe the trial court properly found this evidence more probative than prejudicial.

■ Appellant also contends the trial court committed prejudicial error when it failed to advise the jurors at the time this evidence was introduced that they could consider the evidence solely on the issue of implied malice. In the event we find the issue waived, appellant argues his trial counsel was ineffective for having failed to prompt the court to instruct the jurors at that time.

We note initially that appellant does not challenge the language actually used to instruct the jury on the limited relevance of this evidence or on the law as it relates to the offense of murder.[8] Accordingly, we presume those instructions are correct. We also note the jurors were told at the beginning of trial that they were "not to form or express an opinion on the case until it is

---

[8]During the instructional phase of the trial, the jurors were told that:

"[They] may consider the evidence that Mr. Garcia has previously been arrested and charged with drinking and driving for the limited purpose of determining whether Mr. Garcia learned from that experience that the natural consequences of that conduct are dangerous to human life or phrased in a different way that there was a high probability that the conduct would result in death.

"Further you must determine whether Mr. Garcia knew that this conduct was dangerous to human life at the time of the present offense.

"If you have a reasonable doubt that Mr. Garcia learned from his prior conduct that that conduct was dangerous to life, you must disregard the evidence of that prior conduct.

"You may not consider any evidence of prior incidence of drinking and driving as evidence of Mr. Garcia's bad character, criminal record or violation of any laws."

finally submitted to [them]." Since jurors are presumed to understand and follow the instructions given them (e.g., *People* v. *Delgado* (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811]; *People* v. *Mickey, supra,* 54 Cal.3d at p. 689, fn. 17), the jurors would not have evaluated this evidence until after they received instructions on the limited relevance of this evidence and the case was finally submitted to them. They are also presumed to have properly limited their consideration of the evidence to the issue of implied malice. Appellant has done nothing to rebut these presumptions. He has thus failed to show he was prejudiced by the delay in instructing the jury.

## II

### A. *Gross Vehicular Manslaughter While Intoxicated as a Lesser Offense of Murder*

▇ Appellant claims he stands convicted of both the greater offense of murder and the lesser included offense of vehicular manslaughter for the death of Miss Prado. He insists his conviction for the latter must be reversed because it is a lesser included offense of murder. He cites *People* v. *Moran* (1970) 1 Cal.3d 755, 763 [83 Cal.Rptr. 411, 463 P.2d 763], and *People* v. *Watson* (1983) 150 Cal.App.3d 313, 320 [198 Cal.Rptr. 26] (*Watson II*) in support of his position.

Respondent argues both convictions should be allowed to stand. Respondent reads *Moran* as prohibiting a single charged offense to support a conviction of both a greater and lesser offense. Thus, according to respondent, the *Moran* holding does not preclude convictions where, as here, both the greater and lesser offenses are separately charged in this same proceeding. Respondent believes this is particularly true in light of the language contained in section 954 and the holding of *People* v. *Pearson* (1986) 42 Cal.3d 351, 357-358 [228 Cal.Rptr. 509, 721 P.2d 595]. Alternatively, respondent argues that gross vehicular manslaughter while intoxicated is not a lesser included offense of murder.

▇ Our Supreme Court "has long held that multiple convictions may *not* be based on necessarily included offenses." (*People* v. *Pearson, supra,* 42 Cal.3d at p. 355, citing *People* v. *Moran, supra,* 1 Cal.3d at p. 763; *People* v. *Bauer* (1969) 1 Cal.3d 368, 375 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]; *People* v. *Smith* (1950) 36 Cal.2d 444, 448 [224 P.2d 719]; *People* v. *Greer* (1947) 30 Cal.2d 589, 602 [184 P.2d 512].) Application of this rule has not been limited to cases like *Moran* which result in dual convictions arising out of a single charged offense. It has also been applied

when greater and lesser included offenses were separately charged in the same action. (*Smith, supra,* 36 Cal.2d at pp. 445, 448.)

■ We begin our limited inquiry by determining whether gross vehicular manslaughter while intoxicated is a lesser included offense of murder.[9]

The initial question is: what is the offense we are dealing with? In our view, whether the crime is murder in the first degree, murder in the second degree, voluntary manslaughter or involuntary manslaughter, all of these define a type of homicide that is unlawful. "Homicide is the killing of a human being by a human being and may be excusable, justifiable or felonious." (*People* v. *Caetano* (1947) 29 Cal.2d 616, 618 [177 P.2d 1], disapproved on other ground in *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187.) While murder is divided into degrees, these relate to the gravity of the unlawful homicide and the punishment. (§§ 187, 190.)

"Manslaughter is the unlawful killing of a human being without malice. It is of three kinds . . . ." (§ 192.)

■ " 'The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense.' " (*People* v. *Pearson, supra,* 42 Cal.3d 351, 355, quoting *People* v. *Greer, supra,* 30 Cal.2d 589, 596; accord, *People* v. *Lohbauer* (1981) 29 Cal.3d 364, 368-369 [173 Cal.Rptr. 453, 627 P.2d 183].) One looks to the elements of the offenses and not the evidence to make this determination. (*People* v. *Marshall* (1957) 48 Cal.2d 394, 405 [309 P.2d 456]; *People* v. *Rush* (1993) 16 Cal.App.4th 20, 34 [20 Cal.Rptr.2d 15].)

■ At the time of the offense, gross vehicular manslaughter while intoxicated was defined as: "[*T*]*he unlawful killing of a human being without malice aforethought,* in the driving of a vehicle, where the driving was in violation of Section 23152 . . . of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." (§ 191.5, italics added.)

---

[9]Contrary to appellant's representation, he was not convicted of simple vehicular manslaughter. He was instead convicted of gross vehicular manslaughter while intoxicated. Because he asserts a single basis for applying the above referenced rule, i.e., that his conviction for gross vehicular manslaughter while intoxicated is a lesser included offense of murder, we have limited our analysis accordingly.

In *Watson II*, the Third District Court of Appeal confronted the question of whether vehicular manslaughter was a necessarily lesser offense of murder. This issue arose on remand from the California Supreme Court's decision in *Watson I*, *supra*, 30 Cal.3d 290, that second degree murder may be charged when the facts surrounding a vehicular homicide support a finding of implied malice.

At the time of the *Watson II* decision, section 192 provided:

" 'Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

" '1. Voluntary—upon a sudden quarrel or heat of passion.

" '2. Involuntary—in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle.

" '3. In the driving of a vehicle—

" '(a) In the commission of an unlawful act, not amounting to a felony, with gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence.

" '(b) In the commission of an unlawful act, not amounting to felony, without gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence.

" 'This section shall not be construed as making any homicide in the driving of a vehicle punishable which is not a proximate result of the commission of an unlawful act, not amounting to felony, or of the commission of a lawful act which might produce death, in an unlawful manner.' " (*Watson II*, *supra*, 150 Cal.App.3d at p. 322, fn. 5.)

Respondent argues that ". . . gross vehicular manslaughter while intoxicated is not a lesser-included offense within murder. An offense is a necessarily-included offense if the statutory definition of the greater offense includes all of the elements of the lesser so that the greater offense may not be accomplished without necessarily committing the lesser." In effect, respondent argues you can commit murder without using a vehicle or being intoxicated, or committing an unlawful act with gross negligence, etc., therefore section 191.5 cannot be a lesser-included offense.

In our view, what this perspective overlooks is that all types of unlawful homicide have circumstances added to the basic offense whether it is the premeditation and deliberation of first degree murder or the heat of passion of voluntary manslaughter. The point is that neither murder nor manslaughter nor gross vehicular manslaughter while intoxicated can be committed without committing an unlawful killing of a human being which is an unlawful homicide.

As noted in *Watson II,* "We conclude that the three subdivisions of section 192 each define a species of the single crime of manslaughter and that manslaughter—the unlawful killing of a human being without malice—is an offense necessarily included within murder. Where, as here, the evidence so warrants, the court must instruct on that theory of the case even without request. Because of the failure so to instruct, the murder verdicts cannot stand." (*Watson II, supra,* 150 Cal.App.3d at p. 323; cf. *Watson I, supra,* 30 Cal.3d 290, 298 [despite statutory changes in requisite mental state for vehicular manslaughater, crime involved in each version was "*manslaughter,* an offense which consistently has been defined as the unlawful killing of a human being without malice.").]

To say that because a murder can be committed without using a vehicle or being intoxicated, those additional "elements" take it outside the included elements of murder ignores the fact that, for example, murder can be committed without the heat of passion of voluntary manslaughter. Thus, the additional circumstance of heat of passion is no different than that of intoxication or use of a vehicle as they relate to an unlawful homicide. Therefore, we conclude for purposes of the lesser offense analysis of unlawful homicide, the relevant inquiry turns on the core of an unlawful killing of a human being and not on the circumstances or type of unlawful killing.

A similar analysis was utilized in *People* v. *Collins* (1960) 54 Cal.2d 57 [4 Cal.Rptr. 158, 351 P.2d 326]. In *Collins,* the issue was whether what was then described as statutory rape was a lesser offense of forcible rape. Each of the forms of conduct were subdivisions of then section 261 which generally stated, "Rape is an act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under either of the following circumstances . . . ." The court held in part, "The subdivisions of section 261 do not state different offenses but merely define the different circumstances under which an act of intercourse constitutes the crime of rape." (54 Cal.2d at p. 59.)

The court further stated in reference to its own precedent, "In *People* v. *Marshall,* 48 Cal.2d 394, at page 403 . . . it was pointed out that . . . 'this

court considered, as the yardstick for measuring the offenses included within the rape charged, the specific allegations of the accusatory pleading rather than the general code definition of rape as a crime which can be committed in various ways.'" (54 Cal.2d at p. 59.)

While *Collins* involved other issues such as notice, the court in *Lohbauer* took pains to note, "The rationale of *Collins* was that one charged with forcible rape could be convicted of 'statutory' rape under the same statute, provided he had adequate notice and a reasonable opportunity to prepare his defense. The force of that specific holding has been abrogated, of course, by the Legislature's repeal of subdivision 1 of section 261 and the enactment in 1970 of a separate statute, section 261.5, prohibiting sexual intercourse with a female under age 18. In any event, *Collins* had neither redefined a 'necessarily included' offense within the meaning of section 1159, nor departed from the rule of that statute; it had held only that rape was one crime within that meaning. [Citations.] *Collins* is not authority for any expanded definition of 'necessarily included' offenses." (*People* v. *Lohbauer, supra,* 29 Cal.3d at p. 372.)

The essence of *Collins* was that rape was an act of intercourse with a female not the wife of the perpetrator without consent either because the consent was withheld or was legally invalid. In effect, the different definitions for the specific crime, forcible rape, statutory rape, etc., were simply "different circumstances under which an act of intercourse constitutes the crime of rape." (*People* v. *Collins, supra,* 54 Cal.2d at p. 59.) Likewise the specific crimes of murder, voluntary manslaughter, involuntary manslaughter, and vehicular manslaughter are simply different circumstances under which a homicide is unlawful and bear upon punishment. We see section 191.5 as no different. While the statute may create a different set of circumstances defining a type of unlawful homicide, it is, nonetheless, an unlawful homicide. We conclude the analysis of *Watson II* and the reasoning of *Collins* compel this result. In our view, *Lohbauer* does not mandate a different conclusion. Therefore, we find gross vehicular manslaughter while intoxicated to be a lesser included offense of murder.

B. *Remedy**

. . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1832.

## III

### *Government Code Section 13967 Restitution Fine\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Disposition

For the reasons expressed in the unpublished portion of this opinion, we order the conviction of gross vehicular manslaughter while intoxicated reversed and the restitution fine reduced to $200. The trial court is directed to prepare an amended abstract of judgment reflecting these changes and forward a certified copy to the Department of Corrections. In all other respects the judgment is affirmed.

Dibiaso, J., and Reed, J.† concurred.

---

*See footnote, *ante*, page 1832.

†Judge of the Tulare Municipal Court sitting under assignment by the Chairperson of the Judicial Council.