Filed 3/27/14  P. v. Red CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056593 |
| v. | (Super.Ct.No. RIF145336) |
| STEVEN JAMES RED, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey J. Provost, Judge.  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant, Steven James Red, guilty of murder (Pen. Code, § 187, subd. (a))[1] and gross vehicular manslaughter while intoxicated with two prior convictions for driving under the influence (§ 191.5, subd. (d)). The trial court sentenced defendant to prison for a term of 15 years to life. Defendant raises two issues on appeal. First, defendant contends the statutory prohibition against considering evidence of voluntary intoxication for the mental state element in an implied malice murder violates due process and the right to a reliable jury determination of every element of an offense. Second, defendant contends the prosecutor made improper arguments to the jury. We affirm the judgment.[2]

**FACTUAL AND PROCEDURAL HISTORY**

In August 2008, defendant owned a red 1996 Jeep Cherokee. Also in August 2008, defendant had been dating Lisa Moreno (the victim) for approximately five months. On August 19, 2008, between 3:30 and 4:00 p.m., defendant and the victim left defendant's mother's house, where they had been staying.

At approximately 8:00 or 9:00 p.m. on August 19, Arthur Dietz (Dietz) was driving north on Washington Street, in Riverside County. Washington Street is a "very rural two-lane road" with few streetlights. Dietz was a fire captain and had been employed as a fireman for approximately 28 years, but was off duty on the night of

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] Defendant has filed a petition for writ of habeas corpus, which we address in a separate order.

August 19. While driving, Dietz noticed an SUV following so closely behind his pick-up truck that Dietz could not see the SUV's headlights. Dietz was travelling approximately 45 miles per hour, which is the speed limit on the road. Dietz tapped on his brakes. The brake lights illuminated the SUV, and Dietz saw a male driver and a female passenger in the SUV.

After Dietz tapped on his brakes, the SUV moved into the southbound lane—into oncoming traffic—as if to pass Dietz. Due to oncoming traffic, the SUV again moved behind Dietz. Shortly thereafter, the SUV again moved into the southbound lane, causing two oncoming motorcyclists to veer onto the shoulder to avoid a collision. The SUV passed Dietz and the vehicle in front of Dietz. As the SUV passed Dietz, he saw the female passenger in the SUV.

Dietz decided to follow the SUV because he felt "something bad might happen." Dietz increased his truck's speed to approximately 70 miles per hour in an attempt to follow the SUV; however, he was unable to keep pace with the SUV, which he guessed was travelling close to 100 miles per hour.

As Dietz approached the intersection of Washington Street and Huntington Street, he saw the red SUV was upside down. Dietz stopped his truck and walked over to the SUV. Dietz saw the male driver, defendant, crawling out of the SUV through the halfway open passenger-side door. Dietz asked if defendant was injured and then asked about the female passenger—the victim—because Dietz did not see her. After looking under the vehicle, Dietz took a flashlight from his truck and walked down the road. Dietz found the victim. The victim had no pulse and was not breathing. Dietz

3

concluded the victim died. An autopsy of the victim revealed she died from multiple blunt-force traumatic injuries.

Riverside City Police Officer Alexander Kopitch (Kopitch) was part of the Police Department's Major Accident Investigation Team. Kopitch arrived at the accident scene at approximately 9:00 p.m. Defendant did not appear to have suffered any major injuries, but he had scrapes on his arms and blood on his hands. The scrapes on defendant's arms were similar to those caused when an airbag deploys.

Kopitch found the "area of impact"—where the accident began—105 feet north of Huntington Street on an asphalt curb, where "some gouge marks" could be seen, which Kopitch believed were caused by the red Jeep Cherokee. Kopitch found the SUV "struck several items" along Washington Street, including a fence, mailbox, fire hydrant, and a tree. Kopitch believed the items were struck as the vehicle traveled north on Washington Street. Kopitch concluded the SUV rolled over, which left it upside down on the dirt shoulder. The SUV suffered "extensive damage" from rolling over; however, the passenger side of the vehicle was also damaged from the SUV striking the fence, mailbox, fire hydrant, and tree. The SUV's passenger side roof was "significant[ly]" crushed, or collapsed into the vehicle, and the passenger door was open. The driver's side door was "stuck closed," but otherwise the driver's side was "completely intact."

Police Officer Brent Fast (Fast) also arrived at the accident scene at approximately 9:00 p.m. Fast spoke to defendant. Fast (1) smelled alcohol emanating from defendant, (2) noticed defendant's eyes were red and watery, and (3) observed that

defendant's speech was slurred, rapid, and aggressive. Due to defendant's aggressive behavior, Fast did not want to unhandcuff him, so as to have defendant participate in a field sobriety test. Thus, a field sobriety test was not administered.

Officer Siracusa transported defendant to a hospital for an "okay-to-book" exam. Defendant's blood was taken at the hospital, and it was tested for alcohol and drugs. Defendant had a blood alcohol level of 0.17 percent. Defendant's blood also tested positive for methamphetamine. "Methamphetamine was found at 203 nanograms per milliliter, and amphetamine, which is a breakdown product or a metabolite, was found at 11 nanograms per milliliter." A 0.17 percent blood alcohol level combined with a 203 nanogram methamphetamine level is consistent with a person driving under the influence of both alcohol and methamphetamine.

Detective Richard Prince (Prince) inspected the SUV. Prince found long brown hairs in the right front passenger door frame. Due to the location of the strands, Prince believed they were "captured at the time of impact," and therefore could reveal who was sitting in the passenger's seat at the time of the accident. A DNA test was conducted on one of the hair strands, comparing the hair strand to blood samples taken from defendant and the victim. The test revealed the hair taken from the door frame belonged to the victim; the hair did not come from defendant.

Defendant's mother first became aware of defendant's drug abuse in 1987, when defendant was 18 years old. Defendant's mother spoke to him about the dangers of driving while intoxicated. Defendant suffered three prior convictions for driving under the influence (Veh. Code, § 23152, subds. (a) & (b)), in 1988, 1998, and 2001.

Defendant's theory of the case was that he was not driving the SUV when it rolled over—he was in the passenger seat. Defendant presented evidence reflecting other people, including the victim, drove defendant's SUV when he was intoxicated. Defendant also presented evidence reflecting the victim often refused to wear a seatbelt.

The trial court instructed the jury on implied malice in relation to the murder charge. The court explained implied malice can be found where (1) defendant intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time defendant acted, he knew his act was dangerous to human life; and (4) defendant deliberately acted with a conscious disregard for human life. (CALCRIM No. 520.) The jury instruction included the term "express malice," however the term was not defined—only implied malice was defined for the jury.

## DISCUSSION

### A.    VOLUNTARY INTOXICATION

#### 1.    *CONTENTION*

Defendant contends the statutory prohibition against considering evidence of voluntary intoxication for the mental state element in an implied malice murder violates due process and the right to a reliable jury determination of every element of an offense. We disagree.

#### 2.    *FORFEITURE*

The People assert defendant forfeited this issue for appeal by failing to request a voluntary intoxication instruction at the trial court. Defendant asserts the issue has not

6

been forfeited because requesting a voluntary intoxication instruction would have been futile given that former section 22[3] prohibited evidence of voluntary intoxication to negate the capacity to form any particular mental state for a charged crime.  (See *People v. Sandoval* (2007) 41 Cal.4th 825, 837, fn. 4 ["An objection in the trial court is not required if it would have been futile"].)  The People contend an objection would not have been futile because the Supreme Court has not issued an opinion reflecting former section 22 complied with principles of due process.

We interpret the People's argument as follows:  Although there is a statute reflecting voluntary intoxication evidence is prohibited to negate the capacity to form a particular mental state for a charged crime, had defendant requested an instruction concerning voluntary intoxication and implied malice murder, the trial court may have recognized a potential due process violation in the statute and given the jury the requested instruction, therefore, defendant has forfeited the issue.

The People's position that defense counsel theoretically could have requested the instruction and possibly succeeded in his request is unpersuasive.  Given former section 22 and our Supreme Court's rejection of a due process argument related to section 22 (*People v. Atkins* (2001) 25 Cal.4th 76, 93 (*Atkins*)), it would have been nearly impossible for such a request to have been granted.  Accordingly, we conclude it would

---

[3]  Currently section 29.4.

have been futile for counsel to request the voluntary intoxication instruction and therefore also conclude the issue has not been forfeited for appeal.[4]

### 3. *STATUTE*

Former section 22, subdivision (a), provided: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act."

Former section 22, subdivision (b), provided: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."

### 4. *CASE LAW*

#### a) California Supreme Court

In *Atkins*, our Supreme Court wrote, "Finally, we reject defendant's argument that the withholding of voluntary intoxication evidence to negate the mental state of arson violates his due process rights by denying him the opportunity to prove he did not possess the required mental state. (*Montana v. Egelhoff* (1996) 518 U.S. 37, 39-40, 56 [(*Egelhoff*)].)" (*Atkins*, *supra*, 25 Cal.4th at p. 93.)

---

[4] Since we conclude the issue has not been forfeited, we do not address defendant's alternative ineffective assistance of counsel assertion.

b)    <u>United States Supreme Court</u>

(1)    *Plurality*

In *Egelhoff*, the United States Supreme Court considered whether a Montana statute violated due process by prohibiting evidence of voluntary intoxication on the issue of whether a defendant had a particular mental state that was an element of a charged offense.  (*Egelhoff*, *supra*, 518 U.S. at pp. 39-40.)  Chief Justice Rehnquist and Justices Scalia, Kennedy, and Thomas issued an opinion, announced by Justice Scalia (the Scalia plurality), concluding the statute did not violate due process.  (*Id.* at pp. 38, 56.)  Justice Ginsburg filed a concurring opinion.  (*Id.* at p. 56.)  Justice O'Connor filed a dissenting opinion, joined by Justices Stevens, Souter, and Breyer, concluding the statute did violate due process.  (*Id.* at p. 61.)  Thus, *Egelhoff* is a plurality opinion.

(2)    *The Scalia Plurality*

In *Egelhoff*, the defendant argued, "the Due Process Clause requires the admission of all relevant evidence."  (*Egelhoff*, *supra*, 518 U.S. at pp. 51-52.)  The Scalia plurality explained the Due Process Clause does not guarantee a right to introduce all relevant evidence.  (*Id.* at p. 42.)  For example, relevant evidence can be excluded if it is more prejudicial than probative.  (*Ibid.*)

The Scalia plurality explained states have the authority to set forth the procedures under which their laws are carried out, and a state's laws concerning those procedures are "'not subject to proscription under the Due Process Clause unless "[they] offend[]some principle of justice so rooted in the traditions and conscience of our

9

people as to be ranked as fundamental."' [Citations.]" (*Egelhoff*, *supra*, 518 U.S. at p. 43.)

The Scalia plurality considered "historical practice" to be the primary guide for determining whether a principle of justice is fundamental. (*Egelhoff*, *supra*, 518 U.S. at p. 43.) The Scalia plurality noted there is "a lengthy common-law tradition" prohibiting the use of voluntary intoxication to negate the required mental element of a crime. (*Id.* at p. 46.) The Scalia plurality concluded the defendant failed to show that a "'new common-law' rule—that intoxication may be considered on the question of intent—was so deeply rooted at the time of the Fourteenth Amendment (or perhaps has become so deeply rooted since) as to be a fundamental principle which that Amendment enshrined." (*Id.* at p. 48.)

In regard to policy, the Scalia plurality explained that "[a] large number of crimes, especially violent crimes, are committed by intoxicated offenders." The Scalia plurality reasoned that the rule prohibiting consideration of voluntary intoxication "has the effect of increasing the punishment for all unlawful acts committed in that state, and thereby deters drunkenness or irresponsible behavior while drunk." (*Egelhoff*, *supra*, 418 U.S. at pp. 49-50.) Further, the Scalia plurality explained, "[T]he rule comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences. [Citation.]" (*Id.* at p. 50, fn. omitted.)

The Scalia plurality concluded a rule permitting defendants to present evidence of voluntary intoxication on the issue of mens rea was not fundamental, especially in

10

light of the lengthy common-law history and policies supporting the old common law rule. (*Egelhoff*, *supra*, 518 U.S. at p. 51.) The Scalia plurality held, "The people of Montana have decided to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue. Nothing in the Due Process Clause prevents them from doing so . . . ." (*Id.* at p. 56.)

### (3)  Justice Ginsburg's Concurrence

Justice Ginsburg concurred with the Scalia plurality. At the outset, Justice Ginsburg explained that if the Montana statute were merely an evidentiary rule designed to exclude relevant evidence, then it offended due process. (*Egelhoff*, *supra*, 518 U.S. at p. 57.) Justice Ginsburg applied the rule that statutes should be interpreted in a manner that causes them to comply with the Constitution, if such an interpretation is possible. (*Id*. at p. 60.) As a result of that rule, Justice Ginsburg interpreted the Montana statute not "merely an evidentiary prescription," reasoning that the statute did not appear in the evidence section of the Montana statutes. (*Id*. at p. 57.) Instead, Justice Ginsburg viewed the statute as redefining the mens rea requirement for murder, in that it required the prosecutor to prove "the defendant killed 'under circumstances that would otherwise establish knowledge or purpose "but for" [the defendant's] voluntary intoxication.' [Citation.]" (*Id.* at p. 58.) In other words, it was not that voluntary intoxication evidence was relevant but prohibited, rather, voluntary intoxication evidence was legally irrelevant due to the way the statute redefined the mens rea element. (*Ibid.*)

Justice Ginsburg noted various state courts had upheld legislative redefinitions of mens rea requirements. (*Egelhoff*, *supra*, 518 U.S. at p. 59.) Justice Ginsburg

11

concluded the Montana Supreme Court erred by finding the statute violated due process because it failed to interpret the statute in a manner that made the statute constitutional. Justice Ginsburg cited the rule, "[L]egislative enactments plainly capable of a constitutional construction ordinarily should be given that construction.  [Citations.]" (*Id.* at p. 60.)  Justice Ginsburg concluded, "The Montana Supreme Court's judgment, in sum, strikes down a statute whose text displays no constitutional infirmity."  (*Ibid.*)

> c)       Analysis

Defendant contends former section 22 misapplies the *Egelhoff* decision. Defendant asserts Justice Ginsburg's concurrence contains narrower reasoning than the Scalia plurality, and therefore Justice Ginsburg's opinion must be followed, which means the California statute (former section 22) violates due process because Justice Ginsburg concluded a rule designed to exclude relevant evidence violates due process. Defendant contends former section 22 is not a redefinition of the mens rea requirement; rather, it is a law that excludes relevant evidence.

"""When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . .'" [Citation.]' [Citation.]" (*People v. Lopez* (2012) 55 Cal.4th 569, 591.) "'This rule only works in instances where "one opinion can meaningfully be regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions," [citation], that is to say, only when that narrow opinion is the common denominator representing the position approved by at least five justices.  When it is not

possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court.' [Citation.] 'The only binding aspect of such a splintered decision is its specific result . . . .' [Citation.]" (*Ibid.*)

The California Supreme Court has identified the narrowest common ground in the *Egelhoff* opinion. The narrowest common ground, as indentified by our Supreme Court, is that a statute prohibiting evidence of voluntary intoxication on the issue of a particular mental state does not violate due process. (*Atkins*, *supra*, 25 Cal.4th at p. 93; see also *People v. Mendoza* (1998) 18 Cal.4th 1114, 1141 (dis. opn. of Brown, J.).) We are bound to follow our Supreme Court's conclusion in *Atkins*. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455-456.)

Moreover, we agree with our Supreme Court's interpretation. The Scalia plurality interpreted the Montana statute as an evidentiary rule and concluded it did not violate due process. (*Egelhoff*, *supra*, 518 U.S. at pp. 42, 56.) Justice Ginsburg interpreted the Montana statute as a mens rea definition and concluded it did not violate due process. (*Id.* at pp. 57, 60.) The different reasoning concerned the interpretation of the statute. The similar, or common-ground, reasoning concerned due process and the ultimate conclusion that the statute did not offend the Due Process Clause. Therefore, it is reasonable to conclude the narrowest common ground from the *Egelhoff* opinion is that a prohibition on evidence of voluntary intoxication, as it relates to the capability to

13

form a particular mental state, does not violate due process.  In sum, we find defendant's argument to be unpersuasive.

### B.   PROSECUTORIAL MISCONDUCT

#### 1.   *CONTENTION*

Defendant asserts there are four different segments of the prosecutor's closing argument that reflect prosecutorial misconduct.  We address each segment in turn.

#### 2.   *BACKGROUND LAW*

"'"'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.]  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'  [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'  [Citations.]'" [Citation.]"  (*People v. Tully* (2012) 54 Cal.4th 952, 1009-1010.)

#### 3.   *FIRST SEGMENT*

##### a)   Procedural History

The following comments were made during the prosecutor's closing argument to the jury.  For reference, again, the victim's name was Lisa Moreno.

Prosecutor:  "Why, in the 21st century, in the year 2012, under certain circumstances, do we charge murder when an individual drinks or uses drugs and kills somebody while they're driving?  [¶]  No more slaps on the wrist.  No more warnings.

14

No more rehab.  No more excuses.  No more chances.  Someone is dead because of you.

They're not coming back ever.

"Lisa Moreno didn't get a warning.  Lisa Moreno didn't get another chance.  Lisa

Moreno didn't have the option of rehab.  She's dead, leaving an entire family to grieve

in her absence forever.  [¶]  How selfish.  How irresponsible.  You're a murderer.

"[Defense Counsel]:  Your Honor, I'm going to object.  This is improper

argument designed to play on the passions and prejudices of the jury.

"The Court:  Overruled."

b)      Discussion

Defendant asserts the prosecutor's remarks improperly (1) appealed to the

sympathy and passions of the jury, and (2) expressed the prosecutor's personal opinion.

"'It has long been settled that appeals to the sympathy or passions of the jury are

inappropriate at the guilt phase of a criminal trial.'  [Citation.]"  (*People v. Vance*

(2010) 188 Cal.App.4th 1182, 1192.)  It is misconduct for a prosecutor to ask the jury to

view the crime through the victim's eyes, to apply the "Golden Rule," or to "consider

the impact of the crime on the victim's family."  (*Id.* at pp. 1192-1193.)  These types of

arguments are improper because they ask the jury to be swayed by emotion, when the

jury should be objectively looking at the evidence.  (*Ibid.*)  It is also improper for a

prosecutor to express a personal opinion or belief in the defendant's guilt, if the jury

might view the belief as based on information other than evidence presented at the trial.

(*People v. Mincey* (1992) 2 Cal.4th 408, 447.)

15

The prosecutor's remarks in this first segment were answering the question the prosecutor posed, "Why, in the 21st century, in the year 2012, under certain circumstances, do we charge murder when an individual drinks or uses drugs and kills somebody while they're driving?" The prosecutor answered the question using the facts of the instant case, as opposed to a more general policy explanation. The prosecutor explained that defendant was charged with murder, in addition to vehicular manslaughter, because there comes a point where society views the criminal act as more severe than manslaughter. The prosecutor explained that when a person, such as defendant, is so "irresponsible," there comes a point when it is appropriate to charge murder.

While perhaps it would have been a cleaner argument if the prosecutor had answered the question with a more generic policy explanation, using the facts of the case to answer the question did not rise to the level of misconduct. The prosecutor was not asking the jury to consider the impact on the victim's family, he was explaining why a murder charge is sometimes appropriate. When the prosecutor referred to defendant as a murderer, he was not alluding to knowledge of defendant's guilt that was derived from evidence not presented at trial; rather, he was explaining that, under the evidence presented, defendant's criminal act rose to the level of murder—not merely manslaughter—despite defendant being intoxicated at the time of the killing.

### 4. *SECOND SEGMENT*

#### a) <u>Procedural History</u>

Prosecutor: "But it was Lisa Moreno, not [defendant], who paid the ultimate price. [¶] Did Lisa Moreno make some mistakes that night? Sure. She shouldn't have trusted her boyfriend to keep her safe. She shouldn't have trusted her boyfriend that, although he was under the influence, would not drive like a runaway train. Lisa should not have gotten into that car that night. But did Lisa Moreno pay for her mistakes that night? You bet she did. She paid the ultimate price. She wasn't given a jury of her peers. She wasn't given the presumption of innocence. She wasn't given a fair trial. She couldn't call any witnesses on her behalf.

"[Defense Counsel]: Your Honor, I'm going to object. This is inappropriate closing argument.

"The Court: Overruled. [¶] You may continue.

"[Prosecutor]: She couldn't even breathe her last breath. What Lisa Moreno was given was a casket. [¶] Now, the defendant is entitled to a fair trial. He's entitled to the presumption of innocence. But now it's time for [defendant] to pay for his mistakes. He got his fair trial. Now you can take the blinders off. You heard overwhelming evidence that proves the defendant guilty of murder beyond any reasonable doubt.

"Lisa is entitled to justice. Lisa's family is entitled to justice. People who had the misfortune of being on the road with [defendant] deserve justice. The citizens of Riverside County deserve justice. We are entitled to justice against a grown adult with DUIs spanning from the '80s, the '90s, and the 2000s who simply just doesn't get it.

17

"[Defendant], DUIs are dangerous to us, to everyone. If you didn't get it the four [*sic*] other times you were convicted of the same thing, you'll never get it. It's not just a matter of time before you kill someone. [Defendant], you already killed someone. [¶] The only way [defendant] will get it is if you ladies and gentlemen unanimously find him guilty of murder.

"[Defense Counsel]: Your Honor, I'm going to object at this time. That is inappropriate argument. I'd ask to be heard.

"The Court: Overruled."

b)      Discussion

Defendant presents two arguments related to this second segment. First, defendant asserts the prosecutor improperly appealed to the passions and sympathy of the jury with the first half of his comments, such as, "She wasn't given the presumption of innocence. She wasn't given a fair trial. She couldn't call any witnesses on her behalf."

When read in context, the prosecutor was urging the jury not to blame the victim for her death. The prosecutor conceded the victim made a mistake by being a passenger in a car with an intoxicated driver, but the prosecutor wanted the jury not to judge the victim for this "offense," since she did not have the benefit of a trial. The prosecutor was not appealing to the jury to act out of passion and sympathy. To the contrary, the prosecutor was urging the jury *not* to act out of passion and to stay within the confines of the criminal justice system—to not somehow find the victim guilty for her own death, and thus find defendant not guilty, when the victim could not have a trial.

18

Defendant's second argument concerning this segment concerns the second half of the prosecutor's comments, such as, "The citizens of Riverside County deserve justice. We are entitled to justice against a grown adult with DUIs spanning from the '80s, the '90s, and the 2000s who simply just doesn't get it." Defendant asserts the prosecutor improperly urged the jury to be "the voice of the community."

It is misconduct for a prosecutor to "urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem." (*U.S. v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149.)

Read in context, the prosecutor was not asking the jury to be the voice of the community. Rather, the prosecutor asked the jury to hold defendant accountable for his personal actions, and the prosecutor gave the jury the impression that a murder conviction would be the only appropriate remedy for defendant's criminal act given defendant was aware of the dangers of intoxicated driving but continued to drive while intoxicated, ultimately resulting in the victim's death. In other words, the prosecutor was not presenting defendant's past offenses and calling for the jury to protect the community; the prosecutor presented defendant's past offenses as a means of convincing the jury that murder, rather than just vehicular manslaughter, was the

appropriate crime for which defendant should be convicted.  Accordingly, we conclude the prosecutor did not commit misconduct.

5.      *THIRD SEGMENT*

a)      Procedural History

Prosecutor:  "The defendant knows the dangers of drinking and driving because he's a four-time loser.  He's an expert in drugs and alcohol.  I know some of the medical studies out there—we don't have too much on meth.  But perhaps [defendant] lost his calling of being a toxicologist, because he's an expert in the field.  He certainly knows plenty about meth and the dangers of meth and the dangers of alcohol and drinking and driving.  He's got DUIs in the '80s, in the '90s, in the 2000s.  Heck, if he was a sports team, he'd be a dynasty.  The 1990s Cowboys, Troy Aikman, Emmitt Smith, Michael Irvin got nothing on this guy.

"[Defense Counsel]:  I'm going to object again.  He's asking the jury to consider the prior convictions for something other than what it's admissible for.

"The Court:  Overruled."

b)      Discussion

Defendant asserts the prosecutor improperly referenced defendant's prior convictions in order to urge the jury to act as "the voice of the community."

As set forth *ante*, the jury was instructed on implied malice murder.  There are mental and physical components of implied malice.  (*People v. Craven* (2012) 53 Cal.4th 500, 508.)  "[T]he physical component [is] '"the performance of 'an act, the natural consequences of which are dangerous to life,'"'" and the mental component being

20

'"the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'"' [Citation.]" (*Ibid.*) Evidence of a prior drunk driving conviction is relevant to the issue of whether defendant knew his conduct endangered another and had a conscious disregard. (*People v. McCarnes* (1986) 179 Cal.App.3d 525, 533 [Fourth Dist., Div. Two]; *People v. Brogna* (1988) 202 Cal.App.3d 700, 709.)

The prosecutor's references to defendant's past acts of intoxicated driving were not requests for the jury to protect the community from drunk drivers. Rather, the prosecutor was establishing the idea that defendant must have known, due to his many prior convictions, that his conduct endangered the victim's life. Thus, the prosecutor was establishing the connection between the evidence and the law of implied malice. Accordingly, we conclude the prosecutor was not improperly urging the jury to act as the voice of the community.

### 6. *FOURTH SEGMENT*

#### a) Procedural History

Prosecutor: "The defendant can't be punished for both of these crimes because both involve[] the same conduct. The murder is him driving under the influence like a bat out of hell. A gross vehicular manslaughter involves him being under the influence and driving. Just because he can't be punished on both doesn't mean he can't be convicted on both.

"[Defense Counsel]: Your Honor, object [*sic*]. I believe that misstates the law.

"The Court: Overruled."

21

b)     Discussion

Defendant contends the prosecutor committed misconduct by discussing punishment with the jury. The People assert defendant forfeited this issue for appeal by failing to raise a misconduct objection in the trial court.

"'"[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." [Citation.]' [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 760.) Since defendant did not object to the punishment comments at the trial court on the ground of prosecutorial misconduct, we conclude the matter has been forfeited for appeal.

Defendant asserts the issue was not forfeited because, prior to trial, defendant moved to exclude any argument referencing punishment. In response to that motion, the trial court said, "I also presume that both counsel or all counsel will abide by the ethical constraints, and case authority, and *address that if it does appear to have gone over the line.*" (Italics added.)

As set forth *ante*, an objection on the basis of prosecutorial misconduct must be timely. (*People v. Dykes*, *supra*, 46 Cal.4th at p. 760.) Defendant's pretrial motion was discussed on April 26. The prosecutor's closing argument comments were made on May 10. Given the two-week lapse in time, the pretrial motion would not make for a timely closing argument objection. Moreover, the trial court instructed the attorneys to raise the issue again if it appeared counsel had "gone over the line." Thus, counsel

22

needed to raise an objection if there was misconduct.  In sum, we are not persuaded the issue was preserved for appeal.

7.     *CUMULATIVE EFFECT*

Defendant asserts the prosecutor's remarks, when considered together, amount to misconduct.  As set forth *ante*, the prosecutor's remarks in the first three segments did not amount to misconduct, and any misconduct issues in the fourth segment was not preserved for review.  Since we have not found misconduct, there cannot be a cumulative harm.  (*People v. Tully*, *supra*, 54 Cal.4th at p. 1023.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                         J.

We concur:

RAMIREZ _____
            P. J.

CODRINGTON _____
            J.