Filed 10/16/19

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOVAN JERMAINE FELIX,<br><br>        Defendant and Appellant. | C079382<br><br>(Super. Ct. No. 13F07431) |

APPEAL from a judgment of the Superior Court of Sacramento County, Robert M. Twiss, Judge.  Affirmed.

Victor S. Haltom, Retained Counsel for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Carlos A. Martinez, Supervising Deputies Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Part II of the Discussion.

1

Defendant Jovan Jermaine Felix contends the trial court abused its discretion in his trial for attempted murder by introducing evidence of a prior crime and by denying his motions for retrial and to reopen the evidence. We disagree and affirm the judgment.

FACTS AND LEGAL PROCEEDINGS

Defendant and his girlfriend went to the Level Up Lounge in midtown Sacramento late on August 17, 2013. Defendant ordered a Long Island Iced Tea. The bartender, Daniel Petty, made and served the drink. Without tasting the drink, defendant refused it, saying he would not enjoy it. He wanted Petty to make him another drink. His girlfriend said the drink needed more alcohol. Petty said he could add more alcohol, but it would cost more. After the two pushed their drinks away, Petty asked Scott Nguyen, the other bartender on duty, to take over, and he went outside.

Defendant told Nguyen the drink was too sweet. Nguyen offered to make it sourer or to make a different drink, but defendant did not like either suggestion. He and his girlfriend soon left the bar.

Outside, Joleen Esquivel, the bar's general manager, was seated with some friends. Petty was informing her of a conflict in the bar when defendant came out and interrupted them. He said Petty had a "bootsy" or messed-up attitude. Petty explained to Esquivel what had happened, and Esquivel offered to make defendant another drink. Defendant refused the offer. He said he came to the bar a lot and was not coming back.

Commenting on the customer service, defendant said, "This is how places get burned down." Shocked, Esquivel asked, "Are you threatening us?" Defendant replied, "No, but I'm just saying that's how stuff like that happens." He said his girlfriend was a bartender. Addressing the girlfriend, Esquivel explained that as a bartender, she would know that someone who wants more alcohol in a drink must pay for it. Defendant and his girlfriend left.

2

Around 1:30 or 2:00 a.m., Petty and Nguyen began closing the bar along with another bar employee, Angelo Stowers. The bar's DJ, Aaron Jacobson, began packing up his equipment. While they were closing, Stowers had about six ounces of whiskey but did not appear intoxicated. Jacobson had four to six drinks that evening.

As the group was leaving, Nguyen and Stowers noticed defendant around the corner. He was wearing a fisherman's hat pulled over his face. Defendant was with another man, later identified as Cornelius Jones. Jones wore glasses. He appeared disgruntled and had clenched fists. He peered into the building's windows. Nguyen heard Jones ask, "Are these the guys?" Petty heard Jones say, "They both have glasses." Nguyen said to the two men, "What's up?" Stowers told the group to walk away.

As Nguyen was leaving, Jones punched him in the head from behind. Nguyen went to the ground. Stowers grabbed Jones with both arms and body-slammed him to the sidewalk. Jacobson kicked Jones in the back of the head. Defendant lunged at Jacobson and tried to hit him with his fist, but Jacobson kept his distance as defendant chased him.

Jones stood up and brandished a knife. Stowers yelled, "Knife!" and everyone started to disperse. Stowers jumped backward into the street and ran to the other side as Jones chased him. He slipped and lost his footing on the curb. He landed against a wall of a restaurant. He turned, and Jones was almost on top of him. He grabbed Jones's wrist, but Jones stabbed him in the stomach. Stowers pulled out his own knife and slashed Jones across the face. Jones put his left hand up to his face, and Stowers yelled "Cops!" Jones immediately bolted off. A GMC SUV pulled up. Defendant and Jones got in, and the car went away.

Stowers was transported to the hospital, where he underwent surgery to ligate a small artery that had been cut by the stabbing. During the surgery, Stowers's heart stopped beating. Various measures were taken, and his heart restarted within minutes.

Back at the crime scene, Nguyen discovered that two of his car's tires had been slashed. He frequently parked in the same spot when he worked at the bar. Police recovered a pair of glasses by where Jones stabbed Stowers.

Jacobson positively identified Jones in a photo lineup. Police found a GMC Yukon parked outside Jones's residence. When authorities contacted Jones, he was not wearing glasses, although some of his Facebook photos depicted him wearing glasses.

Defendant and Jones were tried jointly before separate juries. Jones was convicted of premeditated attempted murder and other serious crimes. (*People v. Jones* (2019) 32 Cal.App.5th 267, 269.) However, the court declared a mistrial in defendant's case.

After retrial, a jury found defendant guilty of attempted murder, assault with a deadly weapon, and assault by means of force likely to produce great bodily injury. (Pen. Code, §§ 664/187, subd. (a); 245, subds. (a)(1), (4), unless otherwise stated, statutory section references that follow are to the Penal Code.) The court found that defendant committed the assault by means of force likely to cause great bodily injury while released from custody on a primary offense, and that he had a prior strike and serious felony conviction for assault with a firearm. (§§ 12022.1; 245, subd. (a)(2); 667, subd. (a); 667.5, subd. (b)-(i); 1170.12.)

The court sentenced defendant to a state prison term of 28 years four months as follows: a doubled upper term of nine years for a total of 18 years for the attempted murder; a one-third consecutive doubled term of two years for the assault with force; five years for the prior serious felony enhancement, two years for the released from custody enhancement, and, in a separate case, a one-third consecutive term of one year, four months for possession of a firearm by a felon (§ 29800, subd. (a)(1)). The court stayed its sentence on the assault with deadly weapon count under section 654.

4

DISCUSSION

I

*Evidence of Prior Crime*

Defendant contends the trial court erred when it admitted evidence of an armed robbery he committed with Jones in 1994. He claims the robbery was too dissimilar to the current crime to be admitted. It was remote in time, it shared no characteristics with the current crime other than the identity of the perpetrators, and it occurred when defendant was a young teenager.

Defendant argues that admitting the evidence was prejudicial error. The trial court reached the opposite conclusion than the first trial court which had refused to admit the evidence. Defendant claims prejudice is shown because the first trial ended in a hung jury without hearing the evidence, yet the jury in the second trial which heard the evidence convicted him.

We disagree with defendant's contentions.

A.    *Background*

The prosecution proceeded on two theories of attempted murder against defendant: straight aiding and abetting, and aiding and abetting under the natural and probable consequences doctrine. To prove defendant was guilty of attempted murder under a straight aiding and abetting theory, the prosecution had to establish defendant knew that Jones intended to commit murder. (CALCRIM No. 401.) To prove defendant was guilty under the natural and probable consequences doctrine, the prosecution had to establish that a reasonable person in defendant's position would have known that Jones's attempt of murder was a natural and probable consequence under all the circumstances of their common plan to commit assault. (CALCRIM No. 402; see *People v. Vasco* (2005) 131 Cal.App.4th 137, 161-162 [defendant's knowledge that perpetrator was a dangerous,

5

violent paranoid sociopath was relevant to natural and probable consequence determination].)

In the first trial, the prosecution made an in limine motion under Evidence Code section 1101, subdivision (b), to present evidence of two crimes defendant and Jones previously committed together. It argued that the evidence of these crimes would establish that defendant knew Jones well and at the time of the assault knew he had a violent nature and even knew his intent.

One incident occurred on February 12, 1993, when a security guard broke up a fight in a shopping mall. Defendant and Jones were involved. A juvenile found with a gun said defendant gave him the weapon. Defendant was arrested, and Jones was released.

The second incident occurred on January 25, 1994. Defendant, Jones, and two other juveniles robbed a coin store. Aiming a handgun at a customer, Jones said, "Give me all your mother fucking money!" The customer complied. Another juvenile took all the money from the register and a handgun found in a desk drawer. Jones forced an employee at gunpoint to open a watch case, and the juveniles took a tray of Rolex watches. The next day, authorities arrested defendant at a pawn shop with $325 in cash. Defendant and Jones sustained adjudications for this offense and were committed to the California Youth Authority in April 1994.

The first trial court denied the prosecution's motion to admit evidence of these prior crimes. It found the crimes were too remote from, and dissimilar to, the current offenses to qualify for admission under Evidence Code section 1101, subdivision (b). The evidence was also unduly prejudicial under Evidence Code section 352.

In the second trial, the prosecution again asked to admit evidence of the 1993 police incident and the 1994 armed robbery, and it made the same offers of proof. This time, a different trial judge granted the motion as to the 1994 robbery evidence. The court found that whether defendant and Jones associated in 1994 was relevant and highly

6

probative, as was defendant's knowledge of Jones's proclivity for violence. The significance of the evidence, the court stated, "is that they knew each other. They knew each other well enough to engage in this joint—assuming the facts as stated by the People, this joint venture to rob the store." The court reasoned that from the 1994 incident and the facts of the current incident, the jury could find that after defendant left the bar, he contacted Jones to help inflict pain on the people at the bar with the intent to kill, or he contacted Jones knowing that, with Jones's background and history of violence, a possible consequence of the planned assault would be that Jones would attempt to kill.

At trial, the prosecution presented oral and documentary evidence concerning the armed robbery consistent with its offer of proof on the in limine motion. Defendant did not testify in the first trial, but he did in the second. He admitted he participated in the 1994 robbery with Jones and two others when he was approximately 14 years old.

The prosecutor mentioned the armed robbery at least twice in her closing argument. She argued the robbery demonstrated that defendant was not credible. She also argued the robbery showed that Jones's attempt to murder was a natural and probable consequence. Defendant and Jones had such an intimate relationship, they committed a crime when they were in junior high and "they are willing to engage in very dangerous, very violent conduct together."

B.      *Analysis*

Evidence that a person committed a crime is admissible when it is relevant to prove a material fact other than the person's disposition to commit an act. (Evid. Code, § 1101, subd. (b).) The evidence may be used to establish a person's knowledge as well as motive, opportunity, intent, preparation, plan, identity, and the absence of mistake or accident. (*Ibid.*)

7

The California Supreme Court has explained "that '[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' (*People v. Carpenter* (1997) 15 Cal.4th 312, 378-379.) The main policy that may require exclusion of the evidence is the familiar one stated in Evidence Code section 352: Evidence may be excluded if its prejudicial effect substantially outweighs its probative value. Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value. ([*People v.*] *Ewoldt* [(1994) 7 Cal.4th [380,] 404 [(*Ewoldt*)].) This determination lies within the discretion of the trial court. (*People v. Carpenter, supra,* at p. 380.)" (*People v. Kelly* (2007) 42 Cal.4th 763, 783.)

"To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented." (*People v. Jones* (2011) 51 Cal.4th 346, 371.) This court has held that "[w]hether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge defendant is said to have had in mind at the time of the crime." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 241 (*Hendrix*).)

In some cases, only a general similarity may be required, because the knowledge at issue can be derived from different experiences. "For example, knowledge of the dangers of driving while under the influence can be obtained through the general experience of having suffered a driving under the influence (DUI) conviction (*People v. Brogna* (1988) 202 Cal.App.3d 700, 709), from the knowledge obtained in [driving under the influence] classes (*People v. Garcia* (1995) 41 Cal.App.4th 1832, 1848-1850, disapproved on other grounds in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3; *People v. Murray* (1990) 225 Cal.App.3d 734, 746; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532) or from the admonition required by Vehicle Code section

23593 upon a DUI-related conviction.  While prior similar driving conduct and other similar circumstances would enhance the probative value, other crimes evidence may be admissible even though similar only in a general way, i.e., the prior events involve prior DUI offenses.  This is so because in any of these examples, the evidence supports an inference that the defendant was aware of the dangers of driving while under the influence at later times when he or she drove." (*Hendrix, supra*, 214 Cal.App.4th at p. 241, fn. omitted.)

In other cases, more similarity is required between the prior and current incidents to establish knowledge.  "When the knowledge element is akin to absence of mistake or innocent intent, an inference that defendant learned from his experiences and obtained information that establishes the requisite knowledge requires that the previous experiences be similar to the circumstances presented in the charged case.  As our high court has noted, ' "[T]he recurrence of a similar result . . . tends (increasingly with each instance) *to negative accident or inadvertence . . .* or *good faith or other innocent mental state,* and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . ."  [Citation.]  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.'  [Citations.]" '  (*Ewoldt, supra,* 7 Cal.4th at p. 402, italics added; see [*United States*] *v. Miller* (9th Cir.1989) 874 F.2d 1255, 1269 ['when prior crimes are used to establish ". . . absence of mistake or accident," such evidence simply lacks probative value unless it is sufficiently similar to the subsequent offense']; 1 Imwinkelried, Uncharged Misconduct Evidence (rev. ed. 2009) § 5:33, pp. 99-100, [fns. omitted].)  Likewise, to establish knowledge when that element is akin to absence of mistake, the uncharged events must be sufficiently similar to the circumstances of the charged offense to support the inference that what defendant learned from the prior experience provided

9

the relevant knowledge in the current offense." (*Hendrix, supra*, 214 Cal.App.4th at pp. 242-243.)

Applying these standards, we conclude the trial court did not abuse its discretion by admitting evidence of the 1994 robbery. Because defendant could obtain his knowledge of Jones's violent nature from various experiences with him, the prosecution needed only to establish a general similarity between the 1994 robbery and the current crimes. The court did not abuse its discretion in finding that similarity, because in both criminal incidents, Jones, in the presence of defendant, did not hesitate to criminally threaten and assault the victims with a weapon. Defendant thus knew of Jones's violent background and his likelihood to employ violence in this incident. And defendant's long relationship with Jones reduced the potential for undue prejudice arising from the length of time between the two incidents. The two had been friends for many years. Thus, the specific facts of the incident are not as relevant as the common knowledge defendant gained about Jones while participating in the 1994 crime with him.

Other factors support the evidence's probative value over its prejudicial effect. Those factors include the extent to which the source of the uncharged offense evidence is independent of the charged offenses, whether the uncharged offense resulted in criminal convictions, and whether the evidence of the uncharged offense is stronger or more inflammatory than the evidence of the charged offenses. (*People v. Tran* (2011) 51 Cal.4th 1040, 1047; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211.)

These factors are present here. The 1994 robbery resulted in a juvenile adjudication against defendant. The evidence of the robbery was derived from sources independent of the charged offense. In addition, the evidence of the robbery was not stronger or more inflammatory than the evidence of the charged offenses. These factors decreased the potential for the jury to punish defendant for the robbery regardless of its verdicts on the current offenses. They also decreased the likelihood of the jury confusing

10

the issues, as the jury had to separately determine whether the uncharged robbery occurred.

Moreover, the trial court further reduced the potential for undue prejudice when it instructed the jury on the evidence's limited purpose. It instructed the jurors that they could consider evidence of the 1994 robbery solely on the issues of how long defendant had known Jones, how well he knew Jones as of the date of the current offense, and how familiar defendant was with Jones's prior behavior as of the date of the current offense. The jury could consider the evidence for no other purpose. The court specifically directed the jury not to conclude from the evidence that defendant had a bad character or was disposed to commit crime. We presume the jury followed the court's instruction. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1234.)

Under these circumstances, we cannot say the trial court abused its discretion when it determined that Jones's behavior, and the knowledge defendant gained about Jones from his behavior in the 1994 robbery were sufficiently similar to the current offense for the court to admit the evidence for the limited purpose of establishing defendant's knowledge at the time of the crime.

Even if the court abused its discretion in admitting the evidence of the 1994 robbery, the error was harmless. We review evidentiary errors for prejudice by determining whether it was reasonably probable that a jury would have returned a more favorable verdict for defendant had the court not admitted the evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, it was not reasonably probable because the jury received other evidence concerning defendant's knowledge of Jones's violent nature. The jury learned that defendant told a detective investigating the current offense that he knew Jones "is an ex-felon" who "did ten years for cutting his girl." At trial, Deidre Young, Jones's former girlfriend, testified that Jones stabbed her during an attack in 2001. Asked if Jones was a "little hothead," defendant told the same detective that Jones " 'has a little Pitbull, like, just a half breed in him . . . .' "

11

The jury also viewed a video clip extracted from defendant's cell phone. In the video, Jones bragged to defendant about repeatedly striking a woman in the jaw. The video recorded defendant saying, "Corki [Jones]. Blow that bitch out." The jury thus heard more than enough evidence about defendant's knowledge of Jones's violent nature to find defendant guilty of attempted murder under the natural and probable consequences theory. It is not reasonably probable the jury would have returned a more favorable verdict had it not heard evidence of the 1994 robbery.

There was also sufficient evidence of defendant's intent to kill. He threatened the bar manager saying, "This is how places get burned down." He slashed Nguyen's tires and waited by the bar for the employees to leave. He wore a hat to disguise himself. Jones asked, "Are these the guys?" suggesting Jones was trying to determine who defendant wanted him to attack. There also was testimony from Avery Houston, a marijuana seller, who testified that defendant shot him in the back in 1998 during a drug deal. This evidence was ample evidence of defendant's intent to kill in the current offense even if the 1994 robbery evidence had not been admitted.

Defendant contends the alleged error was prejudicial because the first jury that did not receive evidence of the 1994 robbery hung, while the second jury that heard the evidence found him guilty. This point, however, was not the only difference between the two trials. The first jury also did not hear from Jones's prior girlfriend about his stabbing her, nor did it hear from the marijuana seller whom defendant shot in the back. Defendant was not convicted merely because the second court admitted the 1994 robbery evidence. Thus, any error in admitting the evidence was harmless.

II

*Motions for Mistrial and to Reopen*

Defendant argues the trial court abused its discretion when it denied his motions for mistrial and to reopen the evidence after the prosecutor appeared to have argued a fact that the trial court had earlier precluded defendant from raising on the ground of hearsay.

We disagree.

A.    *Background*

Defendant requested to testify that he told Jones on the evening of the attack to call police. The court denied his request. It ruled that the out-of-court statement was self-serving hearsay and less reliable than asking defendant on the witness stand what his state of mind was that night. Defendant had already testified a dozen times that he did not intend to use Jones to commit the assault. The court would not admit any hearsay statements that sought to raise an inference as to his state of mind when there was already direct testimony and circumstantial evidence on that issue.

In her closing argument, the prosecutor stated defendant, Jones, and Jones's wife, the driver of the getaway vehicle, did not call 911.

Defendant sought a mistrial, claiming the prosecutor took an unfair advantage of a fact the court excluded. The trial court denied the motion. It was "surprised" by the prosecutor's argument, and it told her she was "extraordinarily close to the line" and "a very dangerous place for [her] to be." However, it ruled against a mistrial because the prosecutor argued that defendant did not call the police, not that he did not tell Jones to call the police.

The court mentioned that one of its remedies, if it felt the prosecutor had crossed the line, was to reopen the case and let the excluded evidence be presented. The defendant followed up on the court's statement by requesting to reopen the evidence. The court denied the request for the reasons it set forth earlier.

13

B.      *Analysis*

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.  [Citation.]'  (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)  A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' (*People v. Ayala* (2000) 23 Cal.4th 225, 282.)"  (*People v. Collins* (2010) 49 Cal.4th 175, 198.)

The trial court did not abuse its discretion by denying the motion for mistrial.  The prosecutor's statement did not irreparably damage defendant's chance of receiving a fair trial.  Defendant testified several times regarding his state of mind, and the prosecutor's statement did not introduce evidence the court had excluded from trial.

The trial court also did not abuse its discretion by denying the motion to reopen. " 'A "motion to reopen [is] one addressed to the [trial] court's sound discretion." [Citation.]  In determining whether an abuse of discretion occurred, the reviewing court considers four factors: " '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' " [Citation.]' [Citations.]"  (*People v. Masters* (2016) 62 Cal.4th 1019, 1069.)

On balance, these factors weigh in favor of the court's ruling.  The motion was made after both sides rested and the court instructed the jury.  Defendant did not lack diligence in bringing the motion, as he raised it after the prosecutor argued.  However, there was a possibility the jury would accord the new evidence undue emphasis as the statement was self-serving hearsay.  And the new evidence was not significant.  The court

14

had admitted numerous statements by defendant regarding his state of mind.  It thus did not abuse its discretion when it refused to reopen the evidence.

## DISPOSITION

The judgment is affirmed.


_____
HULL, J.


We concur:


_____
BLEASE, Acting P. J.


_____
MURRAY, J.